**In re HERITAGE BOND LITIGATION**

Nos. CV 01–5752 DT(RCX), CV 02–383 DT(RCX), CV 02–993 DT(RCX), CV 02–2745 DT(AJWX), CV 02–6484 DT(RCX), CV 02–6841 DT(RCX), CV 02–6512 DT(AJWX).

United States District Court,
C.D. California.

Jan. 6, 2003.

Robert J. Feldhake, Joshua Mark Wolff, Lisa A. Roquemore, Daniel M. Harkins, Michelle R. Johnson, Feldhake August & Roquemore, Stanley R. Jones, Stanley R. Jones Law Offices, Irvine, CA, for Plaintiffs.

G Cresswell Templeton, III, Steven W. Bacon, Paul M. Porter, Hill Farrer & Burrill, Los Angeles, CA, Jerold V. Goldstein, Jerold V. Goldstein Law Offices, Encino, CA, Eric N. Landau, Steven J. Aaronoff, Shawn M. Harpen, McDermott, Will & Emery, Irvine, CA, Michael Floyd Wright, Ronald S. Caswell, Case, Knowlson, Jordan & Wright, Los Angeles, CA, Gary Kurtz, Gary Kurtz Law Offices, Woodland Hills, CA, Curtis L. Metzgar, Bruce M. Butler, Even, Crandall, Wade & Lowe, Rancho Cucamonga, CA, F X Sean O'Doherty, Lissete Garcia, Gates, O'Doherty, Gonter & Guy, Los Angeles, CA, Victor A. Raphael, Michelle A. Jenkins, Gates, O'Doherty, Gonter & Guy, Irvine, CA, Michael

C. Robinson, Jr., Robinson, Di Lando & Whitaker, Los Angeles, CA, William E. Crockett, Steven R. Skirvin, Dion–Kindem & Crockett, Woodland Hills, CA, Michael H. Raichelson, Michelman & Robinson, Encino, CA, Christopher Frank Wong, Bryan Cave, Santa Monica, CA, Steven H. Schwartz, Schwartz & Jansen, Los Angeles, CA, Steven M. Green, Steven M. Green Law Offices, San Diego, CA, Sheldon E. Eisenberg, Santa Monica, CA, Dirk L. Vincent, Richard D. Gluck, Fairbank & Vincent, Los Angeles, CA, Kevin W. Alexander, Gordon & Rees, San Diego, CA, James F. Dlugosch, St Louis Park, MN, Jeffrey L. Sikkema, Dorsey & Whitney, Irvine, CA, Heather J. Klaas, Brian E. Palmer, Dorsey & Whitney, Minneapolis, MN, Diane L. Dragan, Nitz Walton & Heaton, Las Vegas, NV, Charles R. Grebing, Kimberly Diane Howatt, Wingert, Grebing, Brubaker & Ryan, Steven Cruz Uribe, Douglas M. Butz, K Elizabeth Dunn, Alan D. Leeth, Butz, Dunn, DeSantis & Bingham, San Diego, CA, Michael A. Taitelman, John Donald Guerrini, Freedman & Taitelman, Thomas M. Moore, Peter D. Sunukjian, Drinker, Biddle & Reath, Los Angeles, CA, Mark P. Epstein, Poeschl, Kohn & Epstein, Oakland, CA, for Defendants.

Robert Merlee Doby, III, Cantey & Hanger, Fort Worth, TX, for Plaintiff.

Frank R. Cruz, Barger & Wolen, Los Angeles, CA, Donald Colleluori, Figari & Davenport, Jonathan G. Erwin, Figari, Davenport & Graves, Dallas, TX, Raymond A. Greenberg, Greenberg Law Firm, Calabasas, CA, Betsy C. Manifold, Francis A. Bottini, Jr., Wolf, Haldenstein, Adler, Freeman & Herz, San Diego, CA, Michael J. Schiff, Easton & Schiff, Los Angeles, CA, Frank J. Ozello, Jr., Gray York Duffy, Encino, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS EDWARD J. HENTGES, KENNETH R. LARSEN, JEROME E. TABOLICH, STEVEN W. ERICKSON, AND PAUL R. EKHOLM'S MOTION TO DISMISS CONSOLIDATED FOURTH AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) AND 9(b)**

TEVRIZIAN, District Judge.

## I. Background

### A. Factual Summary

Plaintiffs Betker Partners One, LP ("Betker One"), Betker Partners Three, LP ("Betker Three"), Betker Family Trust ("Betker Trust") (collectively, "Betker Plaintiffs"), and Lori and Michael O'Shea (all party Plaintiffs collectively, "Plaintiffs") bring this action over the alleged misuse of the proceeds of twelve bond offerings against Defendants U.S. Trust Corporation, N.A., U.S. Trust Company of Texas, N.A., and Bank of New York, Inc. (collectively, "Trustee Defendants"); Heritage Healthcare of America, Inc.("Heritage America"), Heritage Geriatric Housing Development VII, Inc., Heritage Geriatric Housing Development VIII, Inc., Heritage Geriatric Housing Development IX, Inc., Heritage Care of Chicago, Inc., Heritage Care of Sarasota, Inc. (collectively, "Heritage Entities"); Heritage Housing Development, Inc. ("HHD"); Health Care Holdings, LLC ("HCH"); CareContinuum, LLC; Heritage Acceptance Corporation; Affiliated Metropolitan Contractors, Inc.; Robert Kasirer ("Kasirer"), Jerold Goldstein ("Goldstein"), and O.V. Bertolini ("Bertolini") (collectively, "Heritage Principals"); Bruce Talley ("Talley"), Debra Kasirer, individually and as Trustee of the Debra Kasirer Trust, and Canon Realty Corporation ("Canon

Realty") (collectively, "Canon Defendants"); Heritage Housing V, Inc.; BMHC Corp.; JDDJ Holdings, L.P.; James E. Iverson ("Iverson"), Victor P. Dhooge ("Dhooge"), John M. Clarey ("Clarey"), James F. Dlugosh ("Dlugosh"), Edward J. Hentges ("Hentges"), Kenneth R. Larsen ("Larsen"), Jerome E. Tabolich ("Tabolich"), Steven W. Erickson ("Erickson"), and Paul R. Ekholm ("Ekholm") (collectively, "Miller & Schroeder Principals"); Joel T. Boehm and Sabo & Green (collectively, "Attorney Defendants"); Valuation Counselors Group, Inc., Coddington Appraisal Services, and Capital Valuation Group (collectively "Defendant Appraisers"), Healthcare Financial Solutions, and Zelenkofske, Axelrod & Co, Ltd. (collectively, "Appraiser/Feasability Defendants").[1]

Plaintiffs' Fourth Amended Complaint ("4AC") alleges twenty causes of action against the various Defendants as follows:

(1) Violation of Rule 10b–5 and Section 10(b) of the Securities and Exchange Act of 1934, against Heritage Entities, HHD, Kasirer, Goldstein and Bertolini (collectively, "Heritage Defendants") as to the Official Statements for the Last Eight (8) Heritage Bond Offerings Dated From December 22, 1997 to March 11, 1999;

(2) "Control Person" Liability Under Section 20(a) of The Securities Exchange Act of 1934, against Heritage Principals (Kasirer, Goldstein and Bertolini), HHD, and Miller & Schroeder Principals as to the Official Statements for the Last Eight (8) Heritage Bond Offerings Dated from December 22, 1997 to March 11, 1999;

(3) Violations of Section 12(a)(2) of The Securities Act of 1933, against the Heritage Entities;

(4) Violations of California Corporations Code Sections 25401 and 25501, against the Heritage Entities;

(5) Control Person Liability Under California Corporations Code Section 25504, against Heritage Principals, Miller & Schroeder Principals, and Talley as to the Official Statements for the Last Eight (8) Heritage Bond Offerings Dated from December 22, 1997 to March 11, 1999;

(6) Joint and Several Liability Under California Corporations Code Section 25504.1, against Heritage Principals, Iverson, Dhooge, Talley, Boehm, and Sabo & Green as to the Official Statements for the Last Eight (8) Heritage Bond Offerings Dated from December 22, 1997 to March 11, 1999;

(7) Joint and Several Liability Under California Corporations Code Section 25504.2, against Appraisal/Feasibility Defendants as to the Official Statements for the Last Seven (7) Heritage Bond Offerings Dated from July 10, 1997 to March 11, 1999;

(8) Negligent Misrepresentation, against Heritage Principals, Miller & Schroeder Principals, and Appraisal/Feasibility Defendants;

(9) Breach of Fiduciary Duty, against Talley;

(10) Negligence, against Talley;

(11) Breach of Contract, against Trustee Defendants;

(12) Negligence, against Trustee Defendants;

---

1. In the Third Amended Complaint, Plaintiffs named the following nineteen defendants for the first time: Bank of New York, Inc., Heritage Housing V, Inc., BMHC Corp., JDDJ Holdings, James Iverson, Victor Dhooge, John M. Clarey, James F. Dlugosh, Edward J. Hentges, Kenneth R. Larsen, Jerome E. Tabolich, Steven W. Erickson, Paul R. Ekholm, Joel T. Boehm, Sabo & Green, Coddington Appraisal Services, Capital Valuation Group, Healthcare Financial Solutions, and Zelenkofske, Axelrod & Co., Ltd. .

(13) Breach of Fiduciary Duty, against Trustee Defendants;

(14) Fraudulent Concealment, against Trustee Defendants;

(15) Intentional Misrepresentation, against Trustee Defendants;

(16) Negligent Misrepresentation, against Trustee Defendants;

(17) Bad Faith Breach of Implied Covenant of Good Faith and Fair Dealing, against Trustee Defendants;

(18) Avoidance of Fraudulent Transfers, against the Heritage Entities, HHD, HCH, Heritage Acceptance Corporation, CareContinuum, Affiliated Metropolitan Contractors, Kasirer, Goldstein, JDDJ, and BHMC;[2]

(19) Civil Conspiracy to Commit Fraud, against the Heritage Entities, HHD, HCH, Heritage Acceptance Corporation, CareContinuum, Affiliated Metropolitan Contractors, Kasirer, Goldstein, Boehm, and Sabo & Green[3] (collectively "Conspiracy Defendants");

(20) Avoidance of Fraudulent Transfers to Debra Kasirer, against Debra Kasirer, individually and as Trustee of the Debra Kasirer Trust, and Canon Realty Corporation.

The particular motion at issue before the Court in this Order is Defendants Edward J. Hentges, Kenneth R. Larsen, Jerome E. Tabolich, Steven W. Erickson and Paul R. Ekholm's (collectively, "Moving Defendants") Motion to Dismiss Plaintiffs' Fourth Amended Complaint ("Motion"). Plaintiffs are informed and believe that Miller & Schroeder Financial, Inc. ("Miller & Schroeder"), a Minnesota Corporation doing business in California, was the sole underwriter for all of the Heritage entities except Heritage Chicago for which it was the co-underwriter. (4AC at ¶ 43). Miller & Schroeder was also the broker for each Plaintiff and each Plaintiff maintained a separate brokerage account with Miller & Schroeder. (Id.). Miller & Schroeder is not named as a defendant due to its January, 2002 filing for Chapter 7 bankruptcy relief, and the automatic stay pursuant to 11 U.S.C. § 362. (Id.).

Plaintiffs are informed and believe that Defendant Hentges, an individual residing in Minnesota, was at all relevant times an Executive Vice President and the Chief Compliance Officer of Miller & Schroeder who played an influential and material role in the Heritage bond offerings. (Id. at ¶ 48). Plaintiffs are informed and believe that Defendant Larsen, an individual residing in Minnesota, was at all relevant times the Chief Financial Officer of Miller & Schroeder, and played an influential and material role in the Heritage bond offerings. (Id. at ¶ 49). Plaintiffs are informed and believe that Defendants Tabolich and Erickson, individuals residing in Minnesota, were at all relevant times officers of Miller & Schroeder who played influential and material roles in the Heritage bond offerings. (Id. at ¶¶ 50 & 51). Plaintiffs are informed and believe that Defendant Ekholm, an individual residing in Minnesota, was at all relevant times a Senior Vice President of Miller & Schroeder and played an influential and material role in the Heritage bond offerings. (Id. at ¶ 52). Furthermore, Plaintiffs allege that they first learned of Moving Defendants' and other Miller & Schroeder Principals' identity and involvement in the wrongful conduct alleged in this action after filing the Second Amended Complaint. (Id. at ¶ 53).

---

**2.** Plaintiffs name JDDJ and BHMC in the Cause of Action for Avoidance of Fraudulent Transfers for the first time in the 4AC.

**3.** Plaintiffs name Attorney Defendants in the Cause of Action for Civil Conspiracy to Commit Fraud for the first time in the 4AC.

The following facts are alleged in the 4AC and are relevant to Moving Defendants' Motion to Dismiss, which is presently before this Court:

From February 1996 through March 1999, Plaintiffs invested in twelve bond offerings by the Heritage Entities issued by municipal corporations or public finance authorities ("Issuers") pursuant to the terms of an "Indenture of Trust and Security Agreement," "Master Trust Agreement and Mortgage," "Deed of Trust," and/or "Loan Agreement" (collectively, "Indentures"). (*Id.* at ¶¶ 4–5). As part of each bond offering, the Issuer and the entity to which the bond proceeds are loaned published an Official Statement, the purpose of which is to inform potential investors of the nature of the bond offering, to disclose all material facts about the offering, and to explain how the proceeds will be used. (*Id.* at ¶ 6). The Official Statement must contain information sufficient to allow potential investors to make informed decisions about the investment. (*Id.*). The information must be disclosed in a manner that is truthful and not misleading. (*Id.*). It was in reliance on the Official Statements and marketing materials, and believing the truthfulness and thoroughness of the disclosures and representations, that Plaintiffs invested in each of the Heritage Entities' twelve bond offerings. (*Id.* at ¶ 79). In total, Plaintiffs invested, and subsequently lost, $24,855,000 in principal in the Heritage Bonds. (*Id.* at ¶ 92).

According to the Indentures and the Official Statements, the proceeds from each bond offering were expressly loaned to the not-for-profit "Heritage Entities," and all funds were designated and restricted to finance, acquire or renovate the specific healthcare facility project described in the offering documents (collectively, "Heritage Facilities"). (*Id.* at ¶ 7). Each of the Defendants participated in making false or misleading disclosures, wrongfully disbursing and diverting bond proceeds, and/or concealing assets. (*Id.* at ¶ 8).

Kasirer, Goldstein, Bertolini, and other presently unknown Heritage Principals planned to enrich themselves through a scheme based on a series of bond offerings. (*Id.* at ¶ 65). Public entities were enlisted to issue the bonds, which were sold to an underwriter and resold to investors. (*Id.*). Although the bonds were unrated, the Heritage Principals and the underwriter would market the bonds as "municipally approved" and fulfilling an important "charitable" purpose—the establishment and maintenance of geriatric Alzheimer's healthcare facilities. (*Id.*). Then, the Heritage Entities, non-profit corporations controlled by the Heritage Principals, borrowed the bond proceeds and purchased, renovated and ran the facilities. (*Id.*). The Heritage Principals received salaries and lucrative management fees and other financial benefits paid from the bond proceeds and from operating revenue, if generated. (*Id.*). All of the offerings were underwritten by the same investment banker, Miller & Schroeder. (*Id.* at ¶ 66). Each project was overseen by the same trustee, U.S. Trust, pursuant to a "master" indenture, and the Official Statements and other offering and promotional materials were similar. (*Id.*). Additionally, each project was managed by a company controlled by Kasirer, had the same architect, Bertolini, received legal advice from the same corporate counsel, Goldstein, and the same underwriter's counsel, Boehm. (*Id.*). Finally, either Bertolini or Goldstein served as officer of each Heritage Entity. (*Id.*). Except for the legal description of the property and the name of the municipality, the offerings were "cookie cutter," allowing the Heritage Principals to duplicate them one after another. (*Id.*).

The alleged "plan" began with Kasirer purchasing, directly or through companies he controlled, distressed properties, hospitals, of HCA/Columbia Healthcare Corporation. (*Id.* at ¶ 67). Kasirer reportedly purchased the properties at discounts and resold them to the Heritage Entities in the same condition and within a short period of time, at a substantial profit. (*Id.*). The Heritage Entities used bond proceeds from their respective bond offerings to pay Kasirer for the properties, and then to pay Kasirer again through one of his management companies, to manage the renovation and operation of the facilities. (*Id.*). Kasirer, Goldstein and Bertolini formed HHD, and at various times from its inception in 1996 through 1999, Goldstein and Bertolini served as its President and Chairman, and Goldstein also served as its Corporate Counsel. (*Id.* at ¶ 68). Through HHD, Goldstein and Bertolini incorporated the Heritage Entities as purported non-profit companies in which HHD was the only member. (*Id.*). Bertolini served as President and Chairman of each Heritage Entity from 1996 through 1998. (*Id.*). Goldstein served as Corporate Counsel for all the Heritage Entities and as President after 1998. (*Id.*). The Heritage projects did not need to be self-standing because the proceeds from one bond offering were used to pay obligations on other projects, including the salaries and management fees of the Heritage Principals. (*Id.* at ¶ 69). Since the bonds were not general obligations of the public issuers, the Heritage Entities were solely obligated on the bonds, with the real property serving as the only collateral. (*Id.*). If the scheme collapsed, the Heritage Principals intended to simply "walk away." (*Id.*).

Miller & Schroeder, with the help of the Heritage Principals and others, solicited local municipalities to serve as public issuers of the Heritage Bonds. (*Id.* at ¶ 70). Each public Issuer was authorized to loan the proceeds of the bonds to third parties for the purpose of acquiring, constructing, providing, improving, financing and refinancing facilities that the Issuer found to be in the public interest. (*Id.* at ¶ 71). The bonds were payable solely from the revenues derived from the loan agreements with the respective Heritage Entity or from other amounts available under the Indentures. (*Id.* at ¶ 72). Each indenture, except for the Rancho Cucamonga Indenture, provides that the money deposited to such Project fund be held in trust and, except in connection with an event of default, be disbursed only upon receipt of a requisition certificate in a certain form. (*Id.* at ¶ 74).

According to Miller & Schroeder documents, the Heritage Principals (Kasirer, Goldstein and Bertolini) worked closely with Miller & Schroeder Principals and Attorney Defendants in structuring, strategizing and promoting the Heritage Bonds. (*Id.* at ¶ 76). Such documents demonstrating their participation include, but are not limited to the following:

(1) A May 31, 1996 letter from Boehm of Sabo & Green to counsel for a potential municipal issuer stating that "Heritage, along with the various attorneys and consultants working on each project, will assure that full and complete disclosure is made to potential investors with respect to each project in accordance with applicable legal standards." (*Id.* at ¶ 76(a));

(2) A September 6, 1996 memorandum from Boehm to Dhooge of Miller & Schroeder stating Boehm's and Kasirer's projections for marketing. (*Id.* at ¶ 76(b));

(3) Dhooge's handwritten notes showing that he had numerous conferences with Kasirer regarding promotion of the Heritage Bonds. (*Id.* at ¶ 76(c));

(4) A September 13, 1996 memorandum from Dhooge showing that HHD request-

ed a $500,000 loan from Miller & Schroeder, to fund "soft costs" in conjunction with the Heritage Bonds. (*Id.* at ¶ 76(d));

(5) Correspondence from bond counsel, Fulbright and Jaworski, by among others, letters of December 11, 23 and 26, 1996, requesting that Kasirer and Goldstein review and approve draft agreements related to the Heritage Bonds. (*Id.* at ¶ 76(e));

(6) Kasirer's own notes, as well as memoranda from HCH, including an HCH memorandum of April 20, 1998, showing that Kasirer, Goldstein and Bertolini were not only present at "road shows" promoting the Heritage Bonds but were also key speakers at these events and assisted in preparing brochures and slide shows. (*Id.* at ¶ 76(g));

(7) A December 12, 1997 memorandum from Kasirer to bond counsel and copied to Goldstein, Boehm, Dhooge and others, requesting "expedited input" on that memo and all future correspondence. (*Id.* at ¶ 76(h));

(8) A September 17, 1998 memorandum from Dhooge to Kasirer checking on availability for a conference call discussing the St. Joseph Offering. (*Id.* at ¶ 76(i));

(9) A February 23, 1999 memorandum from Dhooge to Kasirer and Boehm regarding a telephonic sales presentation for the Brownsville Offering in which Kasirer was asked to give a status report of all of Heritage's previous and proposed projects. (*Id.* at ¶ 76(j));

(10) Distribution lists from Boehm showing that Kasirer, Goldstein and Bertolini received preliminary and final drafts of the Official Statements for their review, comment and approval prior to publication. (*Id.* at ¶ 76(k)); and

(11) Official Statements for all of the Heritage Offerings signed by Bertolini, except for the last three, which Goldstein signed. (*Id.* at ¶ 76(*l* )).

Miller & Schroeder Principals distributed the Official Statements to Miller & Schroeder's brokers for their use in soliciting purchases of the Heritage Bonds. (*Id.* at ¶ 77). In addition, Dhooge solicited lists of prospective investors for Miller & Schroeder's sales force to cold call. (*Id.*). Miller & Schroeder Principals encouraged Miller & Schroeder brokers to aggressively market the Heritage Bonds through telephonic solicitations of existing clients, cold calls, newspaper advertisements, and television commercials. (*Id.* at ¶ 78). The written advertisements approved by Miller & Schroeder's legal department stated, among other things, that a copy of the Official Statement, the only means by which the bonds were offered for sale, could be obtained by contacting Miller & Schroeder. (*Id.*).

Prior to releasing any bond proceeds to the designated Heritage Entity, the Indentures required U.S. Trust to have received and approved a Requisition Certificate. (*Id.* at ¶ 97). Unbeknownst to Plaintiffs, and contrary to the terms of the Official Statements, the proceeds of each offering were not restricted to the designated project. (*Id.* at ¶ 93). Instead, the Heritage Entities, through their principals, including Kasirer, Goldstein and Bertolini, transferred funds from one Heritage Entity to another, commingling and siphoning off funds. These misappropriations of funds continued from 1996 through 1999, fueled through successive bond offerings. (*Id.*).

The Trustee, U.S. Trust, enabled the Heritage Entities' misappropriation of funds by their carelessness and complicity. (*Id.* at ¶ 94). In contravention of its duties and obligations, U.S. Trust knowingly allowed the Heritage Entities to withdraw funds in advance of the time fixed for payment, based on facially inadequate requisition certificates which violated the Indentures, and permitted the Heritage En-

tities to transfer funds between unrelated projects. (*Id.*). The misappropriation of funds was not disclosed to the bondholders at the time of the disbursements, soon thereafter or as part of any subsequent Heritage Entity's Official Statement. (*Id.*).

Plaintiffs have obtained specific information about the timing and extent of these misappropriations of funds through allegations of Phillip L. Stern in his Complaint in an action against U.S. Trust, Form 990 tax returns filed with the Internal Revenue Service by each of the Heritage Entities, and U.S. Trust's release of bond offering proceeds from Project Funds to Heritage Entities based on non-conforming Certificates. (*Id.* at ¶¶ 95–97). As a result of the improper transfers, bond offering proceeds designated and restricted to one particular project were diverted to and misappropriated by other Heritage Facilities. (*Id.* at ¶ 100). Investors had no way of knowing that the Heritage Projects were not "self-sustaining" but instead kept afloat with new money from successive bond offerings. (*Id.*). In late 1999, Miller & Schroeder refused to underwrite any more offerings, prompting Kasirer to write a letter to Iverson stating in part that "not underwriting these future transactions would be a blow to Heritage's growth ... and could undermine the viability of Heritage as an ongoing entity." (*Id.* at 101). Without new money to sustain the purportedly separate and self-sustaining projects, the entire scheme collapsed, and by 2000, each Heritage Entity had defaulted on the repayment of its bonds, rendering the bonds virtually worthless. (*Id.* at 102).

The Heritage Principals worked closely with Miller & Schroeder Principals and Attorney Defendants to ensure the success of the Heritage Bond Offerings. (*Id.* at ¶ 103). All of these Defendants were on distribution lists for review, comment and approval of preliminary and final drafts of the Official Statements, and as a result, were in positions to know, and did know, that the Official Statements were materially false and misleading. (*Id.*). The misstatements and omissions included the following:

(1) Each of the Official Statements described how proceeds from the specific offerings were to be used and had a table that set out Estimated Sources and Uses of Funds which accounted for 100% of the bond proceeds being used by that particular Heritage Entity, with no amount of funds designated for other Heritage projects or "inter-company loans." (*Id.* at ¶¶ 104 & 105). The Heritage Entities and Heritage Principals knew that the Official Statements were false and misleading in representing that funds would be used only for the purposes specified and only on the designated project because, from the outset, they were affiliates or principals of the entities that misappropriated and received diverted funds on prior projects. (*Id.* at ¶ 107);

(2) Failure to disclose an alleged "accounting discrepancy" reported by the CEO of Heritage Rancho Cucamonga, David Platt, discovered when $1,900,000 intended to purchase needed equipment for the Heritage Rancho facility were not available. (*Id.* at ¶ 108). Plaintiffs are informed and believe that the missing $1,900,000 can be traced to a bank account belonging to Debra Kasirer for the stated purpose of decorating the Heritage Rancho facility, which never actually occurred. (*Id.* at ¶ 110);

(3) Failure to disclose misappropriations of funds between 1997 and 1999 of which a reasonably prudent investor would have wanted to know. (*Id.* at ¶¶ 115–119);

(4) Intentional diversion of funds from one project to another without disclosure by characterizing the funds as "surplus funds" despite express warning not to do

so. (*Id.* at ¶¶ 124 & 126). In a letter dated March 6, 1997, to Boehm and copied to Kasirer, Goldstein, Dhooge and Miller & Schroeder, bond counsel Fulbright & Jaworski advised that bond proceeds from one project could not be used to pay obligations on another project. (*Id.* at ¶ 122). In two letters to Miller & Schroeder, the second of which also went to Boehm, Goldstein stated that "surplus funds of each of the Heritage Group Facilities, in accordance with the Bond Documents, may be transferred to Heritage Housing Development, Inc. for, among other things, intercompany loans for use in various facilities in the Heritage Group to alleviate shortfalls which may arise." (*Id.* at ¶¶ 124 & 125). Goldstein's reference to "surplus funds" was a deliberate misstatement of the fact the Heritage Entities had no surplus funds. (*Id.* at ¶ 126). The letters made it clear to Miller & Schroeder and Boehm and put them on actual notice that the Heritage Defendants had been invading the Heritage Entities reserved funds and intended to continue doing so. (*Id.*). Following the March 6, 1997 letter, the misappropriation of funds continued in deliberate and reckless disregard of counsel's advice and the terms of the Official Statements. (*Id.* at ¶ 127). Furthermore, knowing that it would deter reasonable investors, the Heritage Defendants did not disclose the prior diversion of funds or the present intention to continue diverting funds from one project to another in any of the Official Statements, even the four published after Goldstein's letters. (*Id.* at ¶ 129);

(5) Failure to disclose Platt's retaliatory termination lawsuit filed in August 1997, in which Kasirer was a defendant, in the section contained in the eleven subsequent Official Statements for pending or threatened litigation. (*Id.* at ¶¶ 111–113). The lawsuit detailed Platt's account of a $1,900,000 misappropriation which he reported, placing the Heritage Defendants on further notice of the funds misappropriation. (*Id.*). Firing Platt shortly after he reported the misappropriation, demonstrated the Heritage Defendants' intent to deliberately conceal the misappropriation. (*Id.* at ¶ 112). The Heritage Defendants knew that the funds were being misappropriated and that failure to disclose information about past misappropriations rendered Official Statement representations about funds use false and misleading. (*Id.* at ¶ 115). Furthermore, Attorney Defendants were aware of the $1,900,000 misappropriation. (*Id.* at ¶ 114). Plaintiffs are informed and believed, based on a letter from Sabo & Green to Boehm at Atkinson, Andelson, that Boehm was monitoring the Platt litigation and reporting to Iverson. (*Id.*). The letter stated that "it appeared to us to be simply the claim of a disgruntled ex-employee. Had we known of the discussions between you [Boehm] and Jim Iverson, we might have taken a different view of that case." (*Id.*);

(6) Failure to disclose the Cornerstone litigation filed in July 1998 for breach of a management subcontract, fraud and unfair business practices in any of the five or more Official Statements published while the lawsuit was pending. (*Id.* at ¶¶ 139 & 140). Kasirer and HCH were defendants in this litigation. (*Id.* at 139). The Heritage Defendants not only "omitted" mention of the pending litigation, they affirmatively represented that "no litigation or proceedings are pending or [known to be] threatened." (*Id.* at ¶ 141);

(7) Failure to disclose that the projects were not self sustaining and depended on continued access to new money through additional bond offerings, which is made clear in a May 24, 1999 letter to Miller & Schroeder from Kasirer, signing as Chairman and CEO of HCH, in response to information from Miller & Schroeder that it was unsure if it could continue providing

underwriting services for Heritage's future transactions. (*Id.* at ¶ 129). Kasirer replied that "[n]ot underwriting these future transactions would be a blow to Heritage's growth ... and could undermine the viability of Heritage as an ongoing entity." (*Id.*);

(8) Failure to disclose management problems and negative history, such as prior litigation and business failures, regarding Kasirer. (*Id.* at ¶¶ 143–155). Goldstein and Kasirer were on the distribution list to review and approve Official Statements, and, therefore, knew that material information about Kasirer's background, motives, experience and integrity had been omitted, making such Statements misleading. (*Id.* at ¶ 155);

(9) Failure to disclose excessive management fees paid to HCH and CareContinuum, to which Goldstein testified under oath in Bankruptcy Court on September 11, 2000. (*Id.* at ¶¶ 156–157);

(10) Deliberate Failure to disclose a $500,000 loan in "seed money" made to several Heritage Entities by Miller & Schroeder for which the loan agreement was prepared by Sabo & Green. (*Id.* at ¶¶ 165–168). According to its terms, the loan was secured partly by investor proceeds derived from the anticipated public sale of the bonds. (*Id.* at ¶ 166);

(11) Failure to disclose the relationship between the Heritage Entity and Management as required by the Official Statements. (*Id.* at ¶¶ 170 & 171);

(12) Failure to disclose the unreliability of construction Guarantees where projects could not be completed within the time and/or budgets disclosed in the Official Statements of the offerings. (*Id.* at ¶¶ 172–173). The Heritage Defendants knew or, in the absence of recklessness, should have known that the construction guarantees set forth in the Official Statements were unreliable due to a history of delay and cost-overrun. (*Id.* at ¶ 174);

(13) Failure to disclose the unreliability of appraisals included in each Official Statement representing appreciation of the Heritage Properties of up to 332% in four months, casting doubt on their reliability. (*Id.* at ¶¶ 180–182);

(14) Failure to disclose requisition certificates completed by the designated Heritage Entity prior to the release of any bond funds were consistently submitted improperly in that they regularly requested moneys for projects not pending, thereby facilitating misappropriation of funds. (*Id.* at ¶¶ 183 & 184). In virtually all cases, the requisition certificates were signed by Kasirer or an employee of one of his management companies. (*Id.* at ¶ 184). The submission of the improper requisition certificates facilitation the misappropriation of funds. (*Id.* at ¶ 185).

Each Official Statement contained a continuing disclosure section requiring disclosure of any material "modification to rights of the holders of the Bonds." (*Id.* at ¶ 187). Numerous events occurred that materially modified the rights of existing bondholders including the misappropriation of bond funds, payment of excessive management fees, significant construction delays and cost-overruns. (*Id.* at ¶ 188). The failure of the Heritage Defendants and Miller & Schroeder to disclose any of these matters, despite knowledge and continuing obligation to do so, was material and done knowingly or with deliberate recklessness. (*Id.* at ¶ 189).

**B. Procedural Summary**

On June 29, 2001, Plaintiffs filed a Complaint.

On October 24, 2001, Plaintiffs filed a First Amended Complaint.

On December 14, 2001, Defendant Jerold Goldstein filed a Motion to Dismiss First Amended Complaint, or in the Alter-

native, For a More Definite Statement, which this Court granted in part and denied in part on January 22, 2002. The Order was thereafter entered on January 23, 2002.

On December 28, 2001, this Court, upon its own motion, issued an Order to Show Cause as to why this action should not be dismissed for lack of prosecution as to Defendants Heritage Healthcare of America, Inc., Heritage Geriatric Housing Development VII, Inc.; Heritage Geriatric Housing Development VIII, Inc., Heritage Geriatric Housing Development IX, Inc., Heritage Care of Chicago, Inc., Heritage Care of Sarasota, Inc., Heritage Housing Development, Inc., Health Care Holdings, LLC, CareContinuum, LLC, Heritage Acceptance Corporation, Affiliated Metropolitan Contractors, Inc., Valuation Counselors Group, Inc., and Robert Kasirer.

On January 9, 2002, Plaintiffs filed Requests for Entry of Default against Defendants Affiliated Metropolitan Contractors, Inc. and the Heritage Entities (Heritage Healthcare of America, Inc., Heritage Geriatric Housing Development VII, Inc.; Heritage Geriatric Housing Development VIII, Inc., Heritage Geriatric Housing Development IX, Inc., Heritage Care of Chicago, Inc., Heritage Care of Sarasota, Inc., Heritage Housing Development, Inc., Health Care Holdings, LLC, and Heritage Acceptance Corporation).

On January 10, 2002, Plaintiffs filed a Response to the December 28, 2001 Order to Show Cause, in which Plaintiffs informed this Court they filed the above Requests for Default as to Defendants Affiliated Metropolitan Contractors, Inc. and the Heritage Entities. Plaintiffs also informed this Court Defendants CareContinuum, LLC, Health Care Holdings, LLC and Robert Kasirer requested and received a Stipulation and Proposed Order for a continuance of the responsive pleading date.

On January 10, 2002, Default by the Clerk was entered as to Defendants Affiliated Metropolitan Contractors, Inc.; Heritage Healthcare of America, Inc.; Heritage Geriatric Housing Development VII, Inc.; Heritage Geriatric Housing Development VIII, Inc.; Heritage Geriatric Housing Development IX, Inc.; Heritage Care of Chicago, Inc.; Heritage Care of Sarasota, Inc.; Heritage Housing Development, Inc.; Health Care Holdings, LLC; and Heritage Acceptance Corporation as to the First Amended Complaint.

On March 18, 2002, Plaintiffs filed a Second Amended Complaint ("SAC").

On May 1, 2002, Defendant Jerold Goldstein filed a Motion to Dismiss the First Cause of Action from the Second Amended Complaint, or in the Alternative, For a More Definite Statement. On that same day, Defendant Bertolini filed his Joinder in that Motion. On June 24, 2002, this Court granted the Motion to Dismiss the First Cause of Action as to Goldstein and Bertolini.

On May 1, 2002, Defendants Robert Kasirer, Health Care Holdings, LLC and CareContinuum, LLC, filed a Notice of Motion and Motion to Dismiss. On that same day, Defendant Bertolini filed his Joinder in that Motion. On June 24, 2002, this Court granted in part and denied in part the Motion to Dismiss as to Defendants Robert Kasirer, Health Care Holdings, LLC and CareContinuum, LLC. The Court's ruling also applied to Bertolini insofar as he joined in the Motion. The Order was thereafter entered on June 25, 2002.

On May 1, 2002, Defendants Debra Kasirer (Individually, and as Trustee of the Debra Kasirer Trust) and Canon Realty Corporation filed a Notice of Motion and Motion to Dismiss, which this Court granted on June 24, 2002.

On May 1, 2002, Defendant Talley filed a Notice of Motion to Compel Arbitration, which this Court denied on June 24, 2002. The Order was thereafter entered on June 25, 2002.

On May 6, 2002, Defendant Valuation Counselors Group, Inc., filed a Notice of Motion and Motion to Dismiss, which this Court denied on June 24, 2002. The Order was thereafter entered on June 25, 2002.

On July 1, 2002, Plaintiffs filed an Ex Parte Application for Order Clarifying, Correcting, or Reconsidering Ruling on Motion to Dismiss of Defendants Robert Kasirer, et al., which this Court denied on July 9, 2002.

On July 22, 2002, this Court issued a Minute Order consolidating *Betker Partners v. U.S. Trust, Corp., Kivenson v. U.S. Trust, Corp., N.A., Preston v. U.S. Trust Corp.,* and *U.S. Trust Company TX v. O.V. Bertolini, et al.* and further ordered that *Betker Partners v. U.S. Trust Corp.* serve as the lead case.

On July 24, 2002, Plaintiffs filed a Third Amended Complaint.

On August 5, 2002, a status conference was held at which this Court ordered Defendants to file their responses to Betker's Third Amended Complaint no later than August 26, 2002 and further ordered Counsel to file a Consolidated Amended Complaint no later than September 13, 2002.

On August 23, 2002, U.S. Trust Defendants filed a Notice of Motion and Motion to Dismiss Third Amended Complaint, and a Request for Judicial Notice in Support of the Motion to Dismiss. On October 15, 2002, this Court granted the Request for Judicial Notice and granted in part and denied in part the Motion to Dismiss.

On August 26, 2002, Defendant Talley filed an Answer and Cross-Complaint to Plaintiffs' Third Amended Complaint.

On August 26, 2002 Defendant Jerold Goldstein filed a Notice of Motion and Motion to Dismiss the First, Fourth and Seventh Causes of Action from the Third Amended Complaint, or in the Alternative, For a More Definite Statement, which this Court granted in part and denied in part on September 24, 2002. On the same day, Certain Defendants filed a Request for Judicial Notice in Support of Goldstein's Motion to Dismiss, which this Court granted on September 24, 2002.

On September 13, 2002, Defendants Debra Kasirer and Canon Realty Corporation filed a Notice of Motion and Motion to Dismiss Third Amended Complaint, or in the alternative, for Summary Judgment, which this Court denied on October 15, 2002.

On September 13, 2002, Defendants Robert Kasirer, Health Care Holdings, LLC, CareContinuum LLC, BHMC Corp., and JDDJ Holdings, L.P. filed a Notice of Motion and Motion to Dismiss Third Amended Complaint and a Request for Judicial Notice in Support of the Motion to Dismiss, each of which this Court granted in part and denied in part on October 15, 2002.

On September 13, 2002, Attorney Defendants filed a Notice of Motion and Motion to Dismiss Third Amended Complaint, which this Court granted in part and denied in part on October 15, 2002.

On September 13, 2002, Defendant Boehm filed a Notice of Motion and Motion to Strike Plaintiffs' Third Amended Complaint, which this Court denied on October 15, 2002.

On September 24, 2002, this Court issued a Minute Order instructing Counsel to file their documents directly with Chambers, rather than with the Clerk.

On September 26, 2002, this Court issued a Minute Order continuing the In Re Heritage Bond Litigation Status Conference and all motions set for hearing on

October 7, 2002, to October 15, 2002 at 10:00 a.m., and noting that the briefing schedule for all motions should remain the same.

On October 15, 2002, this Court issued a Minute Order directing the parties to file all documents with the Clerk's Office and further ordering that case numbers CV 02–6484 and CV 02–6841 be consolidated with CV 01–5752.

On October 29, 2002, Plaintiffs filed the Consolidated Fourth Amended Complaint which relates to *Betker Partners One, et al. v. U.S. Trust Corp., et al.,* CV 01–5752 DT (RCx) and *Betker Partners One, et al. v. Kasirer, et al.,* CV 02–6841 DT (RCx).

On October 29, 2002, Plaintiffs filed a Notice of Motion and Motion to Vacate/Modify Ruling on Defendants Sabo & Green and Joel T. Boehm's Motion to Dismiss Third Amended Complaint, which this Court denied on November 25, 2002.

On October 31, 2002, Defendant Bruce Talley filed a Motion to Compel Arbitration, which this Court denied on November 25, 2002.

On November 21, 2002, Defendant James E. Iverson filed a Notice of Motion and Motion to Dismiss Plaintiffs' Fourth Amended Consolidated Complaint, which is presently before this Court.

On November 21, 2002, Defendants Joel T. Boehm and Sabo & Green filed a Notice of Motion and Motion to Dismiss Plaintiffs' Fourth Amended Consolidated Complaint, which is presently before this Court.

On November 21, 2002, Defendants Edward J. Hentges, Kenneth R. Larsen, Jerome E. Tabolich, Steven W. Erickson and Paul R. Ekholm filed a Notice of Motion and Motion to Dismiss Plaintiffs' Fourth Amended Consolidated Complaint, which is presently before this Court.

On December 6, 2002, Defendant CBIZ Valuation filed its Answer to Plaintiffs' Fourth Amended Complaint.

On December 12, 2002, Defendant Bruce Talley filed his Answer to Plaintiffs' Fourth Amended Complaint.

On December 13, 2002, Defendant Healthcare Financial Solutions filed a Notice of Motion and Motion to Dismiss Plaintiffs' Fourth Amended Complaint, which is scheduled to be heard in this Court on January 21, 2003.

On December 16, 2002, Defendant Capital Valuation filed a Notice of Motion and Motion to Dismiss Plaintiffs' Fourth Amended Complaint, which is scheduled to be heard in this Court on January 21, 2003.

## II. *Discussion*

### A. Standards

#### 1. Motion to Dismiss For Failure To State a Claim Upon Which Relief May Be Granted

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a defendant may seek to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Pursuant to Rule 12(b)(6), the court may only dismiss a plaintiff's complaint if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Russell v. Landrieu,* 621 F.2d 1037, 1039 (9th Cir.1980). The question presented by a motion to dismiss is not whether a plaintiff will prevail in the action, but whether a plaintiff is entitled to offer evidence in support of his claim. *Cabo Distributing Co., Inc. v. Brady,* 821 F.Supp. 601 (N.D.Cal.1992). Dismissal is proper under Rule 12(b)(6) only where there is a lack of a cognizable legal theory, or an absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696,

699 (9th Cir.1988). In testing the sufficiency of a complaint, the court must assume that all of the plaintiff's allegations are true, and must construe the complaint in a light most favorable to the plaintiff. *United States v. City of Redwood City,* 640 F.2d 963, 966 (9th Cir.1981) (citing *California Dump Truck Owners Assn. v. Associated General Contractors of America,* 562 F.2d 607, 614 (9th Cir.1977); *McKinney v. DeBord,* 507 F.2d 501, 503 (9th Cir.1974)). Therefore, it is only the extraordinary case in which dismissal is proper. *Corsican Productions v. Pitchess,* 338 F.2d 441, 442 (9th Cir.1964).

Generally, orders granting motions to dismiss are without prejudice unless "allegations of other facts consistent with the challenged pleading could not possibly cure the defect." *Schreiber Dist. v. Serv–Well Furniture,* 806 F.2d 1393, 1401 (9th Cir.1986).

In cases alleging securities laws violations, motions to dismiss are subject to stricter standards because whether a statement or omission is misleading to potential investors "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Fecht v. Price Co.,* 70 F.3d 1078, 1080 (9th Cir.1995) (citation omitted). Thus, "only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Id.* at 1081.

**2. Rule 9(b)**

Pursuant to Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). The particularity requirement is satisfied if the allegations of fraud are specific enough to give a defendant notice of the alleged misconduct so that it can defend against the charge and not just deny any wrongdoing. *See Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985). The Ninth Circuit has interpreted Rule 9(b) to require the pleader to state "the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Misc, Service Workers, Drivers, & Helpers, Teamsters Local #427 v. Philco–Ford, Corp.,* 661 F.2d 776, 782 (9th Cir. 1981). Mere conclusory allegations, or allegations of neutral facts identifying the transaction are insufficient. *See In Re GlenFed,* 42 F.3d at 1547–48. "The plaintiff must set forth what is false or misleading about the statement, and why it is false." *Id.*

**3. The Private Securities Litigation Reform Act**

On December 22, 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") which amended the Securities Exchange Act of 1934. The PSLRA applies to any private securities litigation, meaning those actions not brought by the Securities and Exchange Commission. The present action is brought by private Plaintiffs based on alleged violations of SEC Rules 10b–5 and 20A. Therefore, the PSLRA applies. The PSLRA mandates strict pleading requirements for securities fraud actions. 15 U.S.C. § 78u–4 provides that where a private plaintiff alleges that a defendant has made false or misleading statements, the complaint *must* "[s]pecify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*

Further, with respect to each alleged false or misleading statement or omission, the complaint must "state with particularity the requisite state of mind." 15 U.S.C. § 78u–4(b)(2). This standard applies to all statements, forward-looking and non forward-looking. In the event that both of these requirements are not met, this Court must dismiss Plaintiff's complaint. 15 U.S.C. § 78u–4(3)(A).

The Ninth Circuit addressed the pleading standards established by the Reform Act in *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir.1999). The Court held that the PSLRA requires plaintiffs to "plead particular facts giving rise to a strong inference of deliberate recklessness." *See Silicon Graphics,* 183 F.3d at 979. In order to satisfy this standard, plaintiffs must "state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." *Id.* at 974.

## B. Analysis

Moving Defendants bring this Motion to Dismiss the Second, Fifth and Eighth Causes of Action for Control Person Liability under Section 20(a) of the Securities Exchange Act of 1934, Control Person Liability under California Corporations Code Section 25504, and Negligent Misrepresentation, respectively.

### 1. Moving Defendants' Motion to Dismiss Plaintiffs' Second Cause of Action for Control Person Liability Under Section 20 of the Securities Exchange Act of 1934 is Granted

Plaintiffs bring their Second Cause of Action against Moving Defendants for Control Person Liability under Section 20(a) as to the Official Statements for the Last Eight (8) Heritage Bond Offerings Dated from December 22, 1997 to March 11, 1999. Moving Defendants contend that such claims should be dismissed because (1) they are barred by the statute of limi-

tations; (2) Plaintiffs have failed to properly plead a primary violation of Section 10(b) and Rule 10b–5 in that they have failed to plead facts constituting fraud with sufficient particularity, or specific facts creating a strong inference that Miller & Schroeder acted with scienter; and (3) Plaintiffs have failed to properly plead that Moving Defendants are control persons.

### a. Plaintiffs' Section 20 Claims are Barred by the Statute of Limitations

Plaintiffs first asserted claims against Moving Defendants in the Third Amended Complaint ("TAC") filed on July 24, 2002. At the time of filing the TAC, the applicable statute of limitations provided that claims under Sections 10(b) and 20(a) must be brought "within one year after the discovery of facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e); *see also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, n. 9, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); *Regan, et al. v. Wash. Nat'l Ins. Co., et al.,* 1995 WL 396570 (D.Ariz.); and *Theoharous v. Fong,* 256 F.3d 1219, 1228 (11th Cir.2001).

On July 30, 2002, however, President Bush signed the Sarbanes–Oxley Act of 2002 (the "Act") which amends the statute of limitations for private rights of action involving fraud, deceit, or manipulation in contravention of federal securities laws and provides that such claims "may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." Pub.L. No. 107–204, § 804(a), 116 Stat. 745, 801 (July 30, 2002). The Act further provides that the revised limitations period "shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act." Pub.L. No. 107–204, § 804(b), 116 Stat. 745, 801 (July 30, 2002). On August 30, 2002, following passage of

the Act, Plaintiffs filed a new and separate complaint ("Second Complaint") for damages that asserted federal securities claims against Moving Defendants and others identical to those in the TAC.[4] At the October 15, 2002 hearing, this Court ordered CV 01–5752 consolidated with CV 02–6841. Therefore, Plaintiffs contend that, because the Second Complaint was filed after July 30, 2002, the longer statute of limitations provided by the Act is applicable. Moving Defendants, however, argue that because the Second Complaint asserts identical claims against the same parties, and because the claims were already barred by the existing statute of limitations at the time the new statute of limitations was passed, the shorter statute of limitations effective at the time the TAC was filed applies.

### i. Plaintiffs' Claims Barred by the Existing Statute of Limitations at the Time the Sarbanes–Oxley Act was Enacted, Cannot be Revived by the Amended Statute of Limitations

■ The Sarbanes–Oxley Act was recently enacted and, therefore, questions regarding interpretation of the Act, including which claims the new statute of limitations applies to, have not yet been addressed by the courts. However, the language of the Act, "a claim of fraud, deceit, manipulation, or contrivance," indicates that the new statute of limitations is meant to apply to Section 10(b) claims. Therefore, it likely applies to Section 20(a) claims for control person liability based on a primary violation of Section 10(b) as well.[5]

The Act clearly states that it applies where the proceeding is commenced after the date of enactment. However, it does not address a situation where a claim filed after the date of the Act's enactment is identical to one commenced prior to the Act's enactment. Furthermore, the Act does not address whether the revised statute of limitations should apply to claims barred by the existing statute of limitations at the time of enactment. Because the Act is not clear as to exactly when the extended statute of limitations should apply, this Court finds that it is appropriate to look at existing law regarding retroactive application of new statutes of limitations.

The Ninth Circuit has held that "a newly enacted statute that lengthens the applicable statute of limitations may not be applied retroactively to revive a plaintiff's claim that was otherwise barred under the old statutory scheme because to do so would 'alter the substantive rights' of a party and 'increase a party's liability.'" *Chenault v. United States Postal Serv.*, 37 F.3d 535, 539 (9th Cir.1994). Therefore, while the amended statute of limitations may apply to proceedings filed after passage of the Act, it cannot apply to claims already barred at the time of its enactment, regardless of the filing date. As a result, Plaintiffs' federal securities claims against Moving Defendants which were time-barred as of July 30, 2002, the date of the Sarbanes–Oxley Act's enactment, cannot be revived by the amended statute of limitations.

### ii. Based on the Existing Statute of Limitations, Plaintiffs' Section 20(a) Claims Were Already Time–Barred Upon the Enactment of the Sarbanes–Oxley Act

■ As previously stated, prior to the Sarbanes–Oxley Act, Section 20(a) claims

---

**4.** *See Betker Partners One, et al. v. Kasirer, et al.,* CV 02–6841 DT (RCx).

**5.** Prior to passage of the Sarbanes–Oxley Act, the same statute of limitations applied to

claims brought under Sections 10(b) and 20(a). *See Theoharous v. Fong,* 256 F.3d 1219, 1228 (11th Cir.2001).

must be brought "within one year after the discovery of facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e). The three-year limit is a period of repose which serves as an outside limit and is not subject to equitable tolling. *Lampf,* 501 U.S. at 363, 111 S.Ct. 2773. The Official Statements relating to the eight bond offerings on which Plaintiffs' Section 20(a) claims are based are dated as follows: (1) December 22, 1997; (2) July 10, 1998; (3) July 24, 1998; (4) August 20, 1998; (5) October 5, 1998; (6) November 13, 1998; (7) December 21, 1998; and (8) March 11, 1999. Plaintiffs' TAC, in which Moving Defendants were first named, was filed on July 24, 2002. Plaintiffs' federal securities claims relate to bond offerings for which Official Statements were all issued prior to July 24, 1999, three years before the TAC was filed. Therefore, based upon a straightforward application of the statute of limitations, and absent tolling, Plaintiffs' federal securities claims were already barred by the three-year statute of repose when the Sarbanes–Oxley Act was passed.

### b. The Class Action Tolling Doctrine Does Not Apply to the Facts of this Case

Plaintiffs argue that, regardless of the applicable statute of limitations, the Section 20(a) claims against Moving Defendants are not time barred because the statute of limitations was tolled by the filing of the class action in *Herrmann, et al. v. Miller & Schroeder Fin., Inc., et al.,* San Diego Superior Court Case No. GIC 778499 ("Herrmann Action") on November 20, 2001. (Opp. at 14:8–14). Specifically, Plaintiffs argue that the filing of the Herrmann Action tolled the statute of limitations because Moving Defendants were named defendants to the same or similar causes of action in the class action complaint. Moving Defendants, however, argue that this Court should not apply the class action tolling doctrine because, among other reasons, to do so would be against the policy behind such doctrine. This Court agrees.

The class action tolling doctrine was first established by the United States Supreme Court in *American Pipe & Construction Company v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). The *American Pipe* Court held that the filing of a class action tolled the statute of limitations for all purported class members who sought to intervene after the denial of class certification. *Id.* at 554, 94 S.Ct. 756. In reaching its decision, the Court reasoned that if tolling were not allowed, putative class members would have to file individual claims to protect themselves against the possibility that the class would not be certified, resulting in a multiplicity of actions and judicial inefficiency. *Id.* at 553–54, 94 S.Ct. 756. Later, the Supreme Court expanded the class action tolling doctrine by holding that it applied not only to parties seeking to intervene, but also to putative class members who bring individual actions after the denial of class certification. *Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345, 350, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). The Ninth Circuit has gone even further, holding that the class action tolling doctrine applies even when class certification is granted and that, in such case, the limitations period begins running again only when a class member "opts out" of the class. *Tosti v. City of Los Angeles,* 754 F.2d 1485, 1488 (9th Cir.1985). The *Tosti* court reasoned that its holding was consistent with the policies behind the Supreme Court's holding in *American Pipe.* Furthermore, the Ninth Circuit stated that "[a]pplication of the tolling rule is not limited to those class members who can prove reliance upon the pendency of the class action." *Tosti,* 754 F.2d at 1489. However, in *Tosti,* the plaintiff did not file his individual action

until after a decision regarding class certification had been made. Furthermore, Plaintiffs have not cited any cases in which the class action tolling doctrine was applied where the plaintiff filed his action prior to a decision regarding class certification. Although it appears that the Ninth Circuit has not yet addressed this question, courts in other circuits have declined to apply the class action tolling doctrine under such circumstances. *See, e.g., Rahr v. Grant Thornton, LLP,* 142 F.Supp.2d 793, 799–800 (N.D.Tex.2000); *Stutz v. Minnesota Mining Manufacturing Co.,* 947 F.Supp. 399, 403 (S.D.Ind.1996); *In re Brand Name Prescription Drugs Antitrust Litig.,* No. 94–C 897, MDL 997, 1998 WL 474146, *8 (N.D.Ill. Aug.6, 1998).

In this case, Plaintiffs filed their original Complaint on June 29, 2001, almost five months before the Herrmann Action was filed. Although Moving Defendants were not named at that time, the TAC in which they were named was filed only eight months after the Herrmann Action was filed and prior to a determination regarding class certification.[6] In *American Pipe,* the Supreme Court balanced the plaintiffs rights against those of the defendants in determining whether the filing of a class action tolled the statute of limitations as to all putative class members. The Court found that the purpose of class actions, avoiding needless multiplicity of actions and judicial efficiency, warranted tolling the statute of limitations because, otherwise, a putative class member would be forced to file his own individual action, "precisely the multiplicity of activity which Rule 23 was designed to avoid ...." *Am. Pipe,* 414 U.S. at 551, 94 S.Ct. 756. It

then held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* at 554, 94 S.Ct. 756. Thus, while reliance on the class action need not be proven, the class action tolling doctrine does not apply to individuals who would not be parties to the suit if it continued as a class action. As the *Rahr* court stated, the class action tolling doctrine was never intended to apply to plaintiffs "who file separate suits prior to a decision being reached on the class certification issue," because "none of the judicial efficiency purposes of the doctrine [would be] served by applying it to plaintiffs who voluntarily pursue their individual claims even before the court determines whether the class is viable." This Court finds that the class action tolling doctrine does not apply in this case because Plaintiffs voluntarily filed their own action prior to a certification decision in the Herrmann Action, clearly indicating a lack of intent to be a party to the Herrmann Action should it be permitted to continue as a class action. Plaintiffs should not be permitted to benefit from tolling while at the same time pursuing their own action.

Therefore, Plaintiffs' Section 20(a) claims are time-barred and Moving Defendants Motion to Dismiss the Second Cause of Action is granted. Accordingly, it is unnecessary for this Court to address Moving Defendants' arguments regarding failure to properly plead such claims although in this Court's opinion, Plaintiffs have properly met the "specificity" of pleading requirements.

---

6. Plaintiffs have not provided this Court with the current status of the Herrmann Action, so this Court assumes that Moving Defendants are correct in their assertion that a decision regarding class certification had still not been reached at the time this Motion was filed.

2. **Moving Defendants' Motion to Dismiss Plaintiffs' Fifth Cause of Action for Control Person Liability Under California Corporations Code § 25504 is Granted in Part**

█ Plaintiffs bring claims against Moving Defendants for Control Person Liability under California Corporations Code Section 25504 as to the Official Statements for the last eight (8) Heritage Bond Offerings dated from December 22, 1997 to March 11, 1999. Moving Defendants argue that Plaintiffs' claims against them for violation of California Corporations Code § 25504 are barred by the applicable statute of limitations and that Plaintiffs have failed to properly plead such claims. Specifically, Defendants contend that the California Corporations Code claims should be dismissed for the "same reasons Plaintiffs' federal securities law claims should be dismissed." (Motion, at 21). Plaintiffs, though, argue that the Fifth Cause of Action is not time-barred because the statute of limitations is tolled by the filing of the Herrmann Action, and because inquiry notice is a question of fact not suitable for pre-discovery determination. As previously addressed in this Order, the statute of limitations is not tolled by the Herrmann Action. Therefore, this Court must determine whether Plaintiffs' § 25504 claims are barred by the statute of limitations.

Section 25506 of the California Corporations Code sets forth the statute of limitations for claims brought under Section 25504 and provides that no action shall be brought pursuant to either section "unless brought before the expiration of four years after the act or transaction constituting the violation or the expiration of one year after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire." Cal. Corp.Code § 25506. The four-year bar set forth in § 25506 is an absolute limit on claims. *See*

*S.E.C. v. Seabord Corp.*, 677 F.2d 1301, 1308 (9th Cir.1982).

The Official Statements relating to the eight bond offerings on which Plaintiffs' Fifth Cause of Action is based are dated as follows: (1) December 22, 1997; (2) July 10, 1998; (3) July 24, 1998; (4) August 20, 1998; (5) October 5, 1998; (6) November 13, 1998; (7) December 21, 1998; and (8) March 11, 1999. Plaintiffs' TAC in which Moving Defendants were first named, was filed on July 24, 2002. Claims relating to Official Statements issued before July 24, 1998 fall outside of the four-year limit and, therefore, Plaintiffs' claims relating to the December 22, 1997 and July 10, 1998 Official Statements are time barred. Because Plaintiffs' claims relating to the remaining six Official Statements fall within four years of the date the TAC was filed, this Court must determine whether, as Moving Defendants argue, they are barred by the one-year discovery period.

Where a claim brought pursuant to § 25504 is within the four-year statute of limitations, it must then be determined whether the claim was made within the one-year discovery period set forth in § 25506. The statute of limitations set forth in § 25506 is interpreted in the same manner as the statute of limitations for § 20(a) claims. *See Kramas v. Sec. Gas & Oil, Inc.*, 672 F.2d 766, 770 (9th Cir.1982). Therefore, the one-year limitations period of § 25506 does not begin to run until the plaintiff discovers the facts constituting the violation or in the exercise of reasonable diligence should have discovered them. *Id.* "If the running of the statute of limitations depends upon when the plaintiff became aware, or should have become aware, of a fraud, questions of fact are usually involved." *Id.* Reasonable diligence is tested as an objective standard and may be determined as a matter of law only when "uncontroverted evidence irre-

futably demonstrates plaintiff discovered or should have discovered the fraudulent conduct." *Kramas,* 672 F.2d at 770.

Moving Defendants contend that Plaintiffs discovered the facts constituting the violation by no later than June 29, 2001, the date on which they filed their original complaint.[7] In support of their argument that the filing of the original Complaint triggered the discovery period, Moving Defendants rely on *Theoharous v. Fong* in which the Eleventh Circuit held that the plaintiff need not "have fully discovered the nature and extent of the fraud before he was on notice that something may have been amiss," and that "[i]nquiry notice is triggered by evidence of the *possibility* of fraud, not full exposition of the scam itself." *Id.* at 1228. Moving Defendants further rely on *In re Stac Electronics Sec. Litig.* in which the Ninth Circuit affirmed the district court's finding that where an initial complaint was filed one year and four months prior to an amended complaint naming nine new defendants, the plaintiffs were on inquiry notice, triggering the one-year discovery period, as of the filing of the original complaint. 89 F.3d 1399, 1411 (9th Cir.1996). In *In re Stac,* the Ninth Circuit affirmed the rejection of the plaintiff's argument that it did not have enough information earlier to suspect the involvement of the new defendants on the grounds that "they were fully aware of the suspected fraud at the time they filed their first complaint," and "given further that all of the new defendants were named in the Prospectus and added to the

[amended complaint] on the basis of their corporate positions alone...." Moving Defendants contend that, like *In re Stac,* Plaintiffs had knowledge of the facts constituting the alleged violations on June 29, 2001 when the original Complaint was filed in that (1) they alleged in the original Complaint that the defendants made materially false and misleading statements relating to the promotion of the Heritage bonds; and (2) they knew that Miller & Schroeder was the broker for each Plaintiff and underwriter for all of the bond offerings. (Motion, at 6:17–22). Accordingly, they argue that the one-year discovery period expired on June 29, 2002, prior to the filing of the TAC on July 24, 2002 when Moving Defendants were first named.

Plaintiffs, on the other hand, argue that inquiry notice should not be determined on a pre-discovery motion to dismiss. Specifically, they argue that inquiry notice is a two-step, fact-specific analysis which requires determining (1) when investors were put on notice of fraud such that a reasonable investor would have investigated the matter further, and (2) when a reasonably diligent investor would have discovered the facts underlying the alleged fraudulent activity, thus starting the statute of limitations period. (Opp. at 15:25–16:3) (citing *In re Imperial Credit Indus., Inc.,* 2000 WL 1049320, at * 5 (C.D.Cal. 2000)). Therefore, Plaintiffs point out that they allege in the 4AC that they were unaware of Moving Defendants' wrongdo-

---

7. Although they do not rely on it, Defendants make the additional argument that Plaintiffs actually had notice of the facts constituting an alleged violation as early as September 7, 1999 due to a letter to bondholders disclosing that "the Heritage entities may have utilized funds earmarked exclusively for specific projects for other Heritage Facilities." However, this Court has previously considered this argument and rejected it on grounds that ques-

tions of fact exist as to whether the referenced letters provided Plaintiffs with sufficient notice. (*See* This Court's October 15, 2002 Order Granting in Part and Denying in Part Motion of Defendants Robert Kasirer, Health Care Holdings, LLC, CareContinuum, LLC, BHMC Corp. and JDDJ Holdings, L.P. to Dismiss Third Amended Complaint, at 11:11–14:3).

ing until after the filing of the SAC when they obtained certain Miller & Schroeder documents. They further allege that they were unable to gain access to certain information due to the stay implemented when Miller & Schroeder filed bankruptcy in January of 2002. As a result, they argue that when they reasonably should have discovered Miller & Schroeder's involvement is a question of fact.

This Court has previously held that determining the date upon which Plaintiffs had notice of the allegedly fraudulent activity is a question of fact. Specifically, this Court determined that whether letters written to Miller & Schroeder in 1999 provided Plaintiffs with sufficient notice of fraudulent activity to trigger the discovery period is a question of fact. This Court is still of that opinion.

Plaintiffs first filed suit alleging securities violations in regards to the Heritage bond offerings on June 29, 2001. Furthermore, Plaintiffs allege that Miller & Schroeder was the sole underwriter for all but one of the bond offerings at issue. Although Plaintiffs do state that they were unaware of Miller & Schroeder's involvement until a later date, a factual question remains as to whether Plaintiffs were aware of the fraudulent activity and of Miller & Schroeder's role as underwriter at the time of filing the original Complaint. Plaintiffs' argument that they were unable to access information regarding Miller & Schroeder's involvement due to the stay is persuasive to raise inquiry. Accordingly, dismissal of the remainder of Plaintiffs' Fifth Cause of Action is not warranted on the grounds that such claims are time-barred.

### 3. Dismissal of Plaintiffs' Eighth Cause of Action for Negligent Misrepresentation is Not Warranted at This Time

Finally, Moving Defendants contend that Plaintiffs' Negligent Misrepresentation claim should be dismissed because Plaintiffs failed to plead such claim with sufficient specificity. Specifically, they argue that Plaintiffs have not alleged that each of the Moving Defendants made such misrepresentations. Plaintiffs, however, argue that they have provided sufficient facts to support their claim and that California's indirect deception doctrine applies.[8]

The elements of a claim for negligent misrepresentation are as follows: (1) the defendant must have made a representation as to a past or existing material fact; (2) that representation must have been untrue; (3) regardless of his actual belief defendant must have made the representation without any reasonable ground for believing it to be true; (4) the representation must have been made with the intent to induce the plaintiffs to rely upon it; (5) the plaintiffs must have been unaware of the falsity of the representation; (6) the plaintiffs must have acted in justifiable reliance upon its truth; and (7) the plaintiffs must have sustained damages as a result of such reliance. *See Walters v. Marler*, 83 Cal.App.3d 1, 147 Cal.Rptr. 655 (1978). "Where the defendant makes false statements, honestly believing that they are true, but without reasonable ground for such belief, he may be liable for negligent misrepresentation." *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 407, 11 Cal. Rptr.2d 51, 834 P.2d 745 (1992). Justifiable reliance is also required; "Reliance exists when the misrepresentation or non-

---

**8.** The Court agrees with Moving Defendants that the indirect deception doctrine is not applicable to their argument that Plaintiffs have not adequately alleged facts supporting their claim for negligent misrepresentation.

disclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction." *Alliance Mortgage Co. v. Rothwell*, 10 Cal.4th 1226, 1239, 44 Cal. Rptr.2d 352, 900 P.2d 601 (1995).

In its June 25, 2002 Order, this Court held that "[i]n order to satisfy the elements of a claim of negligent misrepresentation ...", the allegations must be plead pursuant to Rule 8(a)(2), which simply requires "a short and plain" statement of the claim showing that the pleader is entitled to relief. (This Court's June 25, 2002 Order Denying Defendant Valuation Counselors' Motion to Dismiss, at 11:7–10). "Although Fed.R.Civ.P. 9(b) does not expressly apply to a claim for negligent misrepresentation, Fed.R.Civ.P. 8 does require [plaintiffs] to give [defendants] fair notice of the claim against them." *Foster v. Allstate Ins. Co.*, 1995 WL 396646, * 2 (S.D.Cal.). The complaint should state, among other things, the facts alleged to have been misrepresented by the defendant and the identity of the person who made the statements. *See id.* This Court has previously found and continues to find that Plaintiffs have adequately plead the alleged misrepresentations, mostly in the form of omissions from the Official Statements. However, the Court must now determine whether Plaintiffs have adequately attributed the alleged misrepresentations to each of the Moving Defendants. Plaintiffs assert that Moving Defendants were officers of Miller & Schroeder who they are informed and believe played an influential and material role in the Heritage bond offerings. (4AC at ¶¶ 48–52). Specifically, Plaintiffs make the following assertions as to Moving Defendants:

(1) "Edward J. Hentges was an Executive Vice President and the Chief Compliance Officer of Miller & Schroeder. He was responsible for ensuring Miller & Schroeder's compliance with securities laws, including its compliance in connection with the Heritage offerings." (*Id.* at ¶ 198(e));

(2) "Kenneth R. Larsen was the Chief Financial Officer of Miller & Schroeder with knowledge and ability to influence corporate affairs in connection with the financing, structuring, marketing of the Heritage Bonds, including the [sic] and concealment of material facts." (*Id.* at ¶ 198(f));

(3) "Jerome E. Tabolich was an officer of Miller & Schroeder and member of the Credit Committee with responsibility for reviewing the due diligence documentation, the Official Statements, and approving the offer and sale of the Heritage Bonds." (*Id.* at ¶ 198(g));

(4) "Steven W. Erickson was an employee of Miller & Schroeder and member of its Credit Committee with responsibility for reviewing the due diligence documentation, the Official Statements, and approving the offer and sale of the Heritage Bonds." (*Id.* at ¶ 198(h));

(5) "Paul R. Ekholm was a Senior Vice President of Miller & Schroeder and member of its Credit Committee with responsibility for reviewing due diligence documentation, the Official Statements, and approving the offer and sale of the Heritage Bonds." (*Id.* at ¶ 198(i));

(6) Miller & Schroeder Principals knew that investors such as Plaintiffs would rely on their reports, disclosures and diligence in connection with the Heritage offerings. Thus, Moving Defendants assumed a duty to use due care in performing their obligations in order to ensure that the interests of the

bond purchasers and holders were protected and not injured. (*Id.* at ¶ 225); and

(7) In performing their obligations, Miller & Schroeder Principals were careless, if not reckless, and failed to prepare reports and make disclosures that were accurate and not misleading. "In allowing false and misleading information to be published to investors, these defendants acted without regard to the interests of investors and with the knowledge that their negligence would cause investors foreseeable injury." As a result, Plaintiffs were injured. (*Id.* at 226).

This Court finds that these allegations are sufficient at this stage in the litigation process to attribute the alleged misrepresentations to Moving Defendants and withstand a motion to dismiss. Accordingly, Moving Defendant's motion to dismiss the eighth cause of action is denied.

### III.  *Conclusion*

In light of the foregoing, this Court **grants in part and denies in part** Defendants Edward J. Hentges, Kenneth R. Larsen, Jerome E. Tabolich, Steven W. Erickson and Paul R. Ekholm's Motion to Dismiss Plaintiffs' Fourth Amended Complaint as follows:

(1) Moving Defendants' Motion to Dismiss Plaintiffs' Second Cause of Action for Control Person Liability under Section 20 of the Securities Exchange Act is **granted with prejudice and without leave to amend;**

(2) Moving Defendants' Motion to Dismiss Plaintiffs' Fifth Cause of Action for Control Person Liability under California Corporations Code Section 25504 is **granted in part with prejudice and without leave to amend** as to Plaintiffs' claims relating to the De-

cember 22, 1997 and July 10, 1998 Official Statements; and

(3) Moving Defendants' Motion to Dismiss Plaintiffs' Eighth Cause of Action for Negligent Misrepresentation is **denied.**

IT IS SO ORDERED.