Terry SWACK, individually and on behalf of all others similarly situated, Plaintiffs,

v.

CREDIT SUISSE FIRST BOSTON, Elliott Rogers, and Mark Wolfenberger, Defendants.

No. Civ.A. 02–11943–DPW.

United States District Court, D. Massachusetts.

Sept. 21, 2004.

Thomas G. Shapiro, Edward F. Haber, Theodore M. Hess–Mahan, Shapiro Haber & Urmy LLP, Boston, MA, for Plaintiffs.

Sandra S. McQuay, Sullivan, Weinstein & McQuay, P.C., Boston, MA, for Defendants.

Joel B. Strauss, Kaplan, Fox & Kilsheimer LLP, New York, NY, for Movant.

### MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Plaintiff Terry Swack brings this putative class action against Credit Suisse First Boston, its analyst Mark Wolfenberger, and his manager Elliott Rogers under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Securities Exchange Commission Rule 10b–5.[1] Swack alleges that Credit Suisse, through Wolfenberger, issued optimistic research reports concerning the stock of Razorfish, Inc. that were intentionally false and misleading, and that those misleading reports ultimately caused Swack to suffer a loss as Razorfish's artificially inflated stock price eventually came down to earth.[2] Swack alleges that Defendants issued these disingenuously positive research reports, knowing that they were unjustifiable, in order to generate more investment banking fees for Credit Suisse and, consequently, bonuses for Wolfenberger and Rogers.

Congress enacted the Private Securities Litigation Reform Act in part to deter baseless "strike" suits that were sometimes brought on the theory that, if the stock crashed, anyone who ever promoted it must have been lying. The Act imposed a higher pleading standard under which plaintiffs risk dismissal if they do not plead the alleged fraud with specificity. Rather, securities plaintiffs may not commence a securities action until they have amassed enough evidence to state their case with such particularity. With one exception, that is what happened in this case.

Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, arguing that Swack's suit consists of nothing more than generalized allegations

---

1. Plaintiff Terry Swack, a resident of Massachusetts, purchased shares of the common stock of Razorfish, Inc. between May 24, 1999 and May 4, 2001 (the "Class Period"). She seeks to represent all other persons or entities that purchased Razorfish stock during the Class Period.

Credit Suisse First Boston LLC ("Credit Suisse") is a leading global financial services company headquartered in Switzerland but with offices in Boston, Massachusetts. It provides investment research to clients and the general public and also underwrites securities offerings. It managed the initial public offering ("IPO") of Razorfish.

Mark Wolfenberger was a research analyst in Credit Suisse's Global Technology Group ("Tech Group") who provided research reports on Razorfish during the Class Period. Elliott Rogers was a research analyst, Head or Deputy Head of research in the Tech Group, and thus Wolfenberger's superior at Credit Suisse.

2. Razorfish is not a party to this action.

about conflicts of interest. For the reasons set forth below, I will deny the motions of Defendants Credit Suisse and Wolfenberger, but grant the motion of Defendant Rogers.

## I. BACKGROUND

### A. Facts[3]

#### 1. *Factual History*

##### a. *Credit Suisse's Coverage of Razorfish*

In mid–1998, Frank Quattrone[4] came to Credit Suisse to manage their Tech Group. Compl. ¶ 29. Quattrone oversaw both research analysts and sales personnel. *Id.* ¶ 30. Credit Suisse, through the Tech Group, was the lead manager for Razorfish's IPO on April 27, 1999, and afterwards continued to manage a substantial portion of Razorfish's investment banking business. *Id.* ¶ 63. On May 24, 1999 Wolfenberger began research coverage of Razorfish stock with a "buy" rating. *Id.* ¶ 64. He issued further research reports in June and July 1999 reiterating the "buy" rating. *Id.* ¶ 65.

In October 1999, Credit Suisse and Razorfish discussed a secondary stock offering by Razorfish, and Credit Suisse acted as an investment banker advising Razorfish on the acquisition of International Integration Incorporated ("i-Cube") in exchange for Razorfish stock. *Id.* ¶ 66.

In subsequent months, numerous email interactions between Wolfenberger and Dachis suggest close coordination of research reports in order to boost Razorfish's stock price. For example, on October 29, 1999 Wolfenberger sent an email to Jeff Dachis, the CEO of Razorfish, concerning re-initiation of coverage of Razorfish, in which he stated:

> I want your opinion on rating. We would have taken you to a strong buy but given the recent stock run, does it make sense for us to keep the upgrade in our back pocket in case we need it? Either way I don't care. You guys deserve it, I just don't want to waste it.

*Id.* ¶ 76.

Dachis responded that "its [sic] getting hard to justify the valuations," and requested that Wolfenberger "re-initiate with a buy and a higher price target and keep the upgrade for a little while." *Id.* ¶ 77 (adding "[a]lthough its [sic] getting hard to justify the valuations"). Dachis also stated: "[G]et the secondary out above 100, and see how it goes . . . what do you think?" *Id.* ¶ 81. On November 3, 1999 Wolfenberger issued a research report raising Razorfish's rating to "strong buy." *Id.* ¶ 78.

On December 2, 1999 Wolfenberger issued another report rating Razorfish as a "strong buy." *Id.* ¶ 68. In January 2000, the price of Razorfish stock began to decline. *Id.* Nevertheless, Wolfenberger issued "strong buy" ratings from January through May 2000 and set optimistic price targets. *Id.* During this time period, Credit Suisse publicly maintained that its Tech Group was the "largest, most credible and insightful team on Wall Street" and were encouraged "to interpret [industry] information in a fair and objective manner." *Id.* ¶ 47.

On March 3, 2000—a day on which Wolfenberger issued another "strong buy" re-

---

3. For purposes of the motion to dismiss, I "take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993). Citations to the Complaint refer to the Second Consolidated Amended Class Action Complaint in this case.

4. Quattrone is not a party to this action.

port for Razorfish—he sent an email to Dachis proposing a joint plan to boost Razorfish's price: "We'll work the phones, you work the road show." *Id.* ¶ 86. Later that same day, Wolfenberger sent another email to Dachis explaining that "[w]ith the call we made and the market and you on the road, this stock should be higher than $5." *Id.* ¶ 87. As on many (though not a majority) of the dates on which Wolfenberger issued his positive research reports, Razorfish's stock price increased—over 11% for the day, well above the NASDAQ's overall increase of 3.4%. *Id.* ¶ 86.

On June 14, 2000 Wolfenberger emailed Dachis to say "I'd like to do a note before the quiet period to try and move the stock." *Id.* ¶ 88. He sent further emails in July 2000 explaining how he was "working the stock" in the Midwest. *Id.* ¶ 89. In the summer and fall 2000, Wolfenberger continued to issue "strong buy" ratings for Razorfish. Dachis was grateful for the effort. *Id.* ¶ 94 (writing in an email "You da man ... I won't forget this effort ... thank you."); *Id.* 96 (responding to a report forwarded to him, Dachis thanked Wolfenberger by email for the fact that Razorfish—along with many other companies—maintained its "strong buy" while several other "information technology service companies" had been downgraded).

On October 6, 2000 Wolfenberger issued a report rating Razorfish a "strong buy" and set a price target of $15 per share, even though it was then trading at $8.75 per share. *Id.* ¶ 98. That morning Dachis sent an email thanking Wolfenberger, stating "again you da man, we appreciate the continued support." *Id.* On October 27,

2000 Wolfenberger finally lowered his rating to "buy," as Razorfish was trading at $4 per share. *Id.* ¶ 79.

Through the winter of 2000–01 Wolfenberger continued to rate Razorfish a "buy" and set target prices substantially higher than those of other research analysts. On March 20, 2001 Wolfenberger sent an internal email ("the 3/20/01 Email") in which he stated: "I think there is a risk of bankruptcy .... best case is dead money. Could be acquired but hard to call. Would consider reducing exposure." *Id.* ¶ 101. On March 21, 2001 another Credit Suisse analyst sent an email to Defendant Rogers recounting that Wolfenberger had stated that most of his IPOs should never have gone public, and that the companies had collapsed due to structural problems, but nevertheless "we all got our bonuses for a good year." *Id.* ¶ 52.

Credit Suisse maintained its "buy" rating and $5 price target for Razorfish until May 4, 2001, when Razorfish was trading at $1.14 per share, and Wolfenberger finally reduced the rating to "hold." *Id.* ¶ 73.

b. *The Massachusetts, SEC, and NASD Complaints*

On September 12, 2002 Reuters News Service reported that Massachusetts securities regulators had been investigating whether analysts' reports at Credit Suisse had been tainted by the firm's desire to win investment banking business, and indicated that Credit Suisse analysts "may routinely have received compensation that was linked to specific investment banking transactions." [5] Compl. ¶ 21. On April 28,

---

5. On October 21, 2002 the Massachusetts Securities Division's Enforcement Section filed an Administrative Complaint (the "Massachusetts Complaint") against Credit Suisse alleging in part:

> [Tech Group] [a]nalysts disseminated biased, subjective, and compromised research

favorable to CSFB investment banking clients, which resulted in the Tech Group producing millions of dollars in investment banking fees for CSFB. CSFB purposely misled investors by disseminating into the marketplace fraudulent misstatements of fact concerning the companies covered by

2003 the Securities Exchange Commission ("SEC"), based on an independent investigation, filed a complaint (the "SEC Complaint") against Credit Suisse in the United States District Court for the Southern District of New York, alleging violations of federal securities laws.[6] *Id.* ¶ 24. Credit

Suisse entered into multimillion dollar consent decrees to settle both the Massachusetts and SEC complaints. *Id.* ¶ 28.

On March 6, 2003 the National Association of Securities Dealers filed a complaint against Quattrone in his role as manager of Credit Suisse's Tech Group.[7] *Id.* ¶ 107.

the analysts. Moreover, CSFB failed to disclose any of the analysts' conflicts of interest to investors. Compl. ¶ 23.

The *Massachusetts Complaint* alleged that explicitly or implicitly, analysts were instructed that their primary objective was not to provide objective, unbiased advice concerning the stocks they covered, but rather to increase investment banking revenue. Investment bankers could control hiring, firing, promotion, and bonuses paid to analysts, which were based largely on the analyst's willingness and ability to provide research reports that would boost the covered company's stock price. Technology research coverage, purportedly issued for the guidance of investors, was instead used to attract and retain investment banking business. *Id.* ¶¶ 33–45.

According to the Massachusetts Complaint, Tech Group investment bankers imposed an unwritten rule on analysts that "if you can't say something positive [about a company], don't say anything at all." *Id.* ¶ 44. On May 30, 2001 one analyst (not alleged to be Wolfenberger) wrote this rule in an email and forwarded it to Defendant Rogers. According to the *Massachusetts Complaint*, the analyst was then summoned to meet with Credit Suisse's General Counsel, who "told the analyst to delete all copies of the e-mail because he would hate to see [it] appear in the Journal." *Id.* ¶ 45.

The Massachusetts Complaint concluded that Credit Suisse used its research to fraudulently benefit its investment bank business: ... CSFB touted 'independent research' and instead used its research to market its investment banking business.... This was hidden from the public, who relied on the research information. Thus, CSFB perpetrated fraud by the disseminated material misstatements of facts into the marketplace. *Id.* ¶ 46.

6. The SEC Complaint alleged that from 1998 through December 2001, Credit Suisse used its research analysts to "solicit and conduct"

investment banking business with potential investment banking clients. Compl. ¶ 24. It alleged that research analysts were compensated mainly on their contribution to Credit Suisse investment banking deals, and cited an email from Quattrone to analysts requesting that they "submit a list of banking deals in which you participated in a lead or supporting role" in order for the management team to determine analyst compensation. *Id.* ¶ 51.

According to the SEC, analysts were involved in Credit Suisse's investment banking business as early as the sales pitch to a prospective new client. In a "pitch book" presented to one company, Credit Suisse "highlighted that its research analysts maintained a 'strong buy' rating even though the company announced results below estimates." *Id.* ¶ 61. This pitch book included a page titled "CSFB Stands by its Clients," in which it contrasted its own record of providing "strong buy" ratings for IPO clients despite disappointing earnings announcements, with competitors' lower (apparently honest) ratings. *Id.* Credit Suisse "implied and at times implicitly promised [to potential clients] that CSFB would provide positive research if awarded the investment banking business." *Id.*

7. It alleged much of the same misconduct: The Tech Group sought to induce issuers to become investment banking clients ... by holding out the prospect of CSFB's issuing favorable research about them.... Quattrone created a powerful incentive for the analysts to initiate and maintain favorable coverage on investment banking clients by linking their annual bonuses—which sometimes amounted to $10 million or more and represented far and away the largest part of their compensation—to investment banking revenues generated by the Tech Group.... Quattrone encouraged investment bankers to participate in the research analysts' annual performance evaluations and supported the investment bankers' efforts to pressure analysts into initiating and main-

In January 2002, CSFB settled "spinning" (improperly using allocation of IPO shares to obtain investment banking business) charges with the NASD and the SEC for $100 million. *Id.* ¶ 114.

### 2. *Procedural History*

On October 3, 2002 Swack filed the complaint in this case, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. Passing over intermediate developments not relevant to this motion, Swack filed a Second Consolidated Amended Complaint ("the Complaint") on October 20, 2003. The Complaint alleged, first, that all Defendants knowingly or recklessly violated § 10(b) and Rule 10b–5(a)—(c) via schemes, untrue statements and/or omissions of material facts, and practices to defraud purchasers of Razorfish common stock; and second, that Defendants Credit Suisse and Rogers were separately liable under § 20(a) as "controlling person[s]" of Defendant Wolfenberger.

## II. STANDARD OF REVIEW

### A. Motion to Dismiss

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a court must take well-pled factual allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff. *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993). The court, however, need not credit "bald assertions, unsupportable conclusions, or opprobrious epithets." *Chongris v. Bd. of Appeals,* 811 F.2d 36, 37 (1st Cir.1987). Dismissal under Rule 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying

recovery. *Cooperman v. Individual, Inc.,* 171 F.3d 43, 46 (1st Cir.1999).

■ In a securities action, a court, in deciding a motion to dismiss, may properly consider the "relevant entirety of a document integral to or explicitly relied upon in the complaint." *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996). Even if such documents are not attached to the complaint, the defendant may attach them to its motion to dismiss—and a court may consider them—without turning the motion into one for summary judgment. *Id.* This prevents a plaintiff from "excising an isolated statement from a document and importing it into the complaint, even though the surrounding context imparts a plainly non-fraudulent meaning to the allegedly wrongful statement." *Id.*

### B. Heightened Pleading Requirement

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), intended to curb abuse in private securities litigation. 15 U.S.C. § 78u–4; *see Greebel v. FTP Software, Inc.,* 194 F.3d 185, 191 (1st Cir.1999). The PSLRA states, in part:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading,

*Id.* ¶ 109.

---

taining coverage of investment banking clients.... All of these practices compromised the independence and objectivity of the Tech Group's analysts.

the reason or reasons why the statement is misleading, and, *if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.* 15 U.S.C. § 78u–4(b)(1).

Before the PSLRA, a plaintiff who alleged a knowing or intentional falsehood had to meet the requirements of Fed. R.Civ.P. 9(b) by stating the circumstances constituting the falsehood "with particularity."[8] On the other hand, if the complaint did not "sound in fraud"—if, in other words, the plaintiff alleged negligent or innocent misrepresentation—no heightened pleading requirement applied. *See Shaw*, 82 F.3d at 1223.

■ Section 78u–4(b)(1) eviscerates the need to determine whether a complaint "sounds in fraud" because it imposes a heightened pleading requirement on all claims arising out of alleged misrepresentations or omissions. Moreover, the PSLRA's pleading standard is "congruent and consistent with the pre-existing standards" of the First Circuit for Rule 9(b), which have been "notably strict and rigorous." *Greebel*, 194 F.3d at 193. Thus, under the PSLRA, as before under Rule 9(b), a plaintiff must specify each allegedly misleading statement or omission, and additionally, "the plaintiff must not only allege the time, place, and content of the alleged misrepresentations with specificity, but also the factual allegations that would support a reasonable inference that adverse circumstances existed at the time of the offering, and were known and deliberately or recklessly disregarded by defendants." *Id.* at 193–94 (internal quotation marks deleted).

Although the pleading requirements under the PSLRA are strict, they do not alter the underlying Rule 12(b)(6) standard of review. A court must still draw all reasonable inferences from the particular allegations in the plaintiff's favor. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir.2002).

## III. DISCUSSION

Defendants move to dismiss on five principal grounds: (1) that this action is time-barred; and that Swack has not pled (2) a false or misleading statement or actionable omission, (3) that her losses were caused by Defendants' conduct, (4) scienter, or (5) that Credit Suisse or Rogers had "control person" liability for Wolfenberger's conduct.[9]

---

8. Rule 9(b) states in full: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

9. Before delving into these questions, however, I must address a procedural issue that recurs throughout Defendants' motion to dismiss.

Defendants have attached some 35 exhibits to their motion to dismiss, and eight more to their reply memorandum. The ordinary rule is that "any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56." *Watterson*, 987 F.2d at 3. However, "a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Shaw*, 82 F.3d at 1220. Courts may also make "narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint," *Watterson*, 987 F.2d at 3–4, or " 'matters of public record,' " *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 15–16 (1st Cir.2003) (quoting *Boateng v. InterAmerican Univ.*, 210 F.3d 56, 60 (1st Cir.2000)).

Most of the exhibits submitted fall into one or more of these exceptions. Exhibits 2–4,

## A. Statute of Limitations

The parties disagree as to which statute of limitations applies, and when it would begin to run.

### 1. Applicable Limitations Period

From 1991 to July 2002, all "[l]itigation instituted pursuant to § 10(b) and Rule 10b–5 [had to] be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Section 804 of the Sarbanes–Oxley Act of 2002, however, provided a new limitations period under which an action could be timely filed within the earlier of two years after the discovery of the facts constituting the violation, or five years after the violation itself. *See* Pub.L. No. 107–204 § 804, 116 Stat. 745, 801 (2002) (codified at 28 U.S.C. § 1658). Section 804 also provided that "[t]he limitations period ... added by this section, shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act," but that "[n]othing in this section shall create a new, private right of action." Pub.L. No. 107–204 §§ 804(b)—(c), 116 Stat. at 801. The Sarbanes–Oxley Act became effective on July 30, 2002, *see* 116 Stat. at 745, and the first complaint in this case was filed on October 3, 2002. There is, therefore, a question about whether § 804's lengthened limitations period applies here.[10] For the reasons stated below,

however, do not. Exhibit 2 is a complaint filed by Swack in another action; Exhibit 3 is an opposition memorandum filed by a defendant in that action (not a party here); and Exhibit 4 is a complaint filed by plaintiff's counsel in an unrelated action. While these documents are matters of public record, the court may not consider "pleadings, submitted by the plaintiffs in a separate case, against different defendants, to which the plaintiffs have not referred in their amended complaint in the instant case." *Axler v. Sci. Ecology Group, Inc.*, No. 98–10161, 1999 WL 1209512, at *3 (D.Mass. May 21, 1999) (Wolf, J.). Therefore, I decline to take judicial notice of Exhibits 2–4.

With this procedural matter resolved, I now turn to the merits of the motion to dismiss.

10. Defendants argue that the Sarbanes–Oxley Act did not revive claims that were time-barred before its passage; Swack contends that it did. The general rule is that "congressional enactments ... will not be construed to have retroactive effect unless their language requires this result." *Landgraf v. USI Film Products*, 511 U.S. 244, 264, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (internal quotation marks deleted). Congressional intent to make an act retroactive "will not be inferred where the statute 'lacks "clear, strong, and imperative" language requiring retroactive application.'" *Brown v. Hot, Sexy & Safer Productions, Inc.*, 68 F.3d 525, 538 (1st Cir.1995) (quoting *Landgraf*, 511 U.S. at 269, 114 S.Ct. 1483) (quoting *United States v. Heth*, 7 U.S. (3 Cranch) 399, 413, 2 L.Ed. 479 (1806) (opinion of Paterson, J.)). The Supreme Court has only found retroactive effect in " 'statutory language that was so clear that it could sustain only one interpretation.'" *INS v. St. Cyr*, 533 U.S. 289, 316–17, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (internal quotation marks deleted).

Almost all courts considering whether the Sarbanes–Oxley Act's extended limitations period applies retroactively have decided that it does not. *See generally In re ADC Telecommunications, Inc. Securities Litig.*, No. 03–1194, 2004 WL 1898469 (D.Minn. May 17, 2004) (reviewing the debate regarding Sarbane–Oxley's effect on the limitations period in securities cases and concluding that it does not revive time-barred causes of action); *see also In re WorldCom, Inc. Securities Litig.*, No. 02–CV–3288, 02–CV–9499, 2004 WL 1435356, at *7 (S.D.N.Y. June 28, 2004) ("Sarbanes–Oxley does not revive previously time-barred private securities fraud claims."); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. MDL–1446, H–01–3624, 2004 WL 405886, at *17 (S.D.Tex. Feb.25, 2004) (holding that § 804's provision that longer limitations period would apply to proceedings commenced on or after Act's effective date applies to actions that had accrued but were not

I conclude Plaintiff may pursue her claim regardless of the limitations period imposed.

### 2. *When the Period Began to Run*

Swack filed her initial complaint on October 3, 2002. Defendants contend that the limitations period began to run no later than September 2000, at which point Swack was on inquiry notice of the facts underlying her claims because (1) Razorfish's stock price had plummeted to $8–$12 per share, (2) Credit Suisse's ratings of Razorfish remained positive despite the precipitous drop in price, (3) allegations of Wall Street analyst conflicts, including at Credit Suisse, were well known to the market. Swack contends that she did not have sufficient facts to support a claim against Defendants until at least September 12, 2002, when it was reported that investigators had uncovered internal e-mails showing that Credit Suisse analysts had been pressured to recommend stocks to please investment bank clients. Swack further contends that the question of when she was on inquiry notice of her claim is a question of fact not resolvable on a motion to dismiss.

■■■ A complaint may be dismissed on statute of limitations grounds "only if 'the pleader's allegations leave no doubt that an asserted claim is time-barred.'" *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir.2002)

(quoting *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir.1998)). In the securities fraud context, the period "does not begin to run 'until the time when the plaintiff in the exercise of reasonable diligence discovered or should have discovered the fraud of which he complains.'" *Young*, 305 F.3d at 8 (quoting *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 129 F.3d 222, 224 (1st Cir.1997)). "When telltale warning signs augur that fraud is afoot, however, such signs, if sufficiently portentous, may as a matter of law be deemed to alert a reasonable investor to the possibility of fraudulent conduct." *Young*, 305 F.3d at 8.

The First Circuit has a two step process for assessing such warning signs. First, the court determines, as an objective matter, "whether a harbinger, or series of harbingers, should have alerted a similarly situated investor that fraud was in the wind." *Id.* If such "storm warnings" were apparent, the court then determines whether "the investor probed the matter in a reasonably diligent manner." *Id.*

■■■ The defendant has the initial burden of establishing the existence of storm warnings. *Id.* at 9. With that said, "[t]he multifaceted question of whether storm warnings were apparent involves issues of fact .... [and][i]n the archetypical case, therefore, it is for the factfinder to deter-

---

time-barred on July 30, 2002, and not to actions that were already time-barred when Sarbanes–Oxley Act passed); *In re Enter. Mortgage Acceptance Co. Sec. Litig.*, 295 F.Supp.2d 307, 316 (S.D.N.Y.2003) (same); *Glaser v. Enzo Biochem, Inc.*, 303 F.Supp.2d 724, 734 (E.D.Va.2003) (same); *In re Heritage Bond Litig.*, 289 F.Supp.2d 1132, 1148 (C.D.Cal.2003) (same). *But see Roberts v. Dean Witter Reynolds, Inc.*, No. 02–2115–T–26, 2003 WL 1936116, at *3–4 (M.D.Fla. Mar.31, 2003) (concluding, based on legislative history, that Congress intended longer limitations period to apply retroactively).

If the question were simply whether the statute and legislative history supported a colorable argument that Congress intended to revive moribund actions, this would present a close case. Since the standard is far stricter, however, I cannot find that Congress intended § 804 of the Sarbanes–Oxley Act to apply to actions that were time-barred on July 29, 2002. As the following discussion makes clear, however, I need not decide this issue for purposes of this case.

mine whether a particular collection of data was sufficiently aposematic to place an investor on inquiry notice." *Id.; Axler,* 1999 WL 1209512, at *4 (complaint should not be dismissed on statute of limitations grounds because the question of when plaintiff was on inquiry notice is factual).

Defendants' primary argument is that it was widely known to the market that Wall Street research analysts were excessively cozy with the investment bankers, and they cite numerous news articles and speeches by SEC Chairman Levitt to establish this point. One article even states that "Quattrone runs Credit Suisse First Boston's technology practice, one of the rare Wall Street shops that allows the research department to report directly to the head of investment banking. No artifice here: Quattrone's outfit unabashedly combines aggressive banking with supportive research." (Def.Ex. 38).[11]

■ None of this information, however, would have given rise to a § 10(b) cause of action, particularly under the heightened pleading standards of the PSLRA. The articles do not disclose that analyst compensation was specifically tied to revenue from the companies they covered, that analysts solicited the opinion of covered companies' executives as to what ratings to give them, that they actively collaborated with clients to use research ratings to boost stock prices, or that they issued "Strong Buy" ratings even when clients' executives admitted that it was "getting hard to justify the valuations."

Had Swack filed solely based upon the news articles and public information that Defendants claim put her on inquiry notice, her case would have been quickly dismissed. *See, e.g., Pfeiffer v. Goldman, Sachs & Co.,* No. 02–6912, 2003 WL 21505876, at *6 (S.D.N.Y. July 1, 2003) (dismissing complaint because "allegations about a general industry-wide conflict of interest fail[ ] to plead scienter with sufficient particularity"). Rather, she filed her complaint only after the Massachusetts investigation uncovered damaging e-mails that provide more specific evidence to support her claims.

■ The discovery rule does not wait for the plaintiff to acquire facts sufficient to withstand a motion for summary judgment; " 'storm warnings' of the *possibility* of fraud trigger a plaintiff's duty to investigate." *Cooperativa de Ahorro,* 129 F.3d at 224 (internal quotation marks omitted and emphasis added). But "[i]t makes little sense from a policy perspective to require specific factual allegations—on pain of dismissal in cases of this sort—and then to punish the pleader for waiting until the appropriate factual information can be gathered by dismissing the complaint as time barred." *Levitt v. Bear Stearns & Co.,* 340 F.3d 94, 104 (2d Cir.2003) (reversing a district court's dismissal of a securities fraud case as time-barred).

In a case remarkably similar for statute of limitations purposes, Judge Rakoff held that the statute did not begin to run until the SEC disclosed the analyst's emails, thus giving plaintiffs specific evidence of scienter:

> Plaintiffs . . . could not bring suit at the point of [the] disclosures and losses . . . because they had no basis for believing that [the analyst] had intentionally lied when he issued his prior positive reports, and without evidence of such scienter no private action may be brought. . . . [Scienter] did not become known to plaintiffs, and even with the exercise of due diligence could not have

---

**11.** Defense exhibits 36–43 are attached to the Supplemental Affidavit of Lawrence J. Port-noy in Further Support of Defendants' Motion to Dismiss the Complaint.

become known to them, until the SEC disclosed [the analyst]'s emails to the public ... shortly after which this suit was commenced.

*Demarco v. Lehman Brothers, Inc.,* 309 F.Supp.2d 631, 637 (S.D.N.Y.2004). So too here.

For these reasons, I cannot find, on a motion to dismiss, that Swack was on inquiry notice of her claims before September 12, 2002. I turn, therefore, to the merits.

## B. Failure to plead a false or misleading statement or actionable omission

A major component of Swack's complaint is an allegation that Defendants violated Rule 10b–5(b):

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce .... (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]

17 C.F.R. ¶ 240.10b–5.

■ To state a Rule 10b–5(b) claim, a plaintiff must demonstrate "(1) that defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) that defendants acted with scienter; (3) that either plaintiffs or the market relied on the misrepresentation or omission; and (4) resultant injury." *Geffon v. Micrion Corp.,* 249 F.3d 29, 34 (1st Cir.2001).

Defendants argue that Swack has failed to allege a false or misleading statement or omission. They argue that the complaint does not identify a specific false or misleading statement, nor *why* such statements were misleading. *See* PSLRA, 15 U.S.C. § 78u–4(b)(1); *Greebel,* 194 F.3d at 193.

■ Swack claims that the "Buy" and "Strong Buy" ratings that Wolfenberger issued were false and misleading because they implied that Wolfenberger actually believed them to be justified, when in reality he issued them as a *quid pro quo* for Razorfish's continued investment banking business, a portion of which would augment his bonus. Swack's complaint can be fairly read to plead that Wolfenberger did not believe that those ratings were justified. In the 3/20/01 Email, Wolfenberger stated: "I think there is a risk of bankruptcy .... best case is dead money. Could be acquired but hard to call. Would consider reducing exposure." It is true that this email came *after* Wolfenberger's last "buy" recommendation was issued, and a speaker has no "duty to 'correct' an optimistic report with negative information acquired after the issuance of the report so long as the initial report was 'precisely correct' when issued and remained so thereafter." *In re Biogen Sec. Litig.,* 179 F.R.D. 25, 34 (D.Mass.1997) (Saris, J.) (quoting *Backman v. Polaroid Corp.,* 910 F.2d 10, 16–17 (1st Cir.1990) (en banc)). Secret negative reports, however, could support an inference that earlier, more bullish reports were false at the time they were made. *See Demarco,* 309 F.Supp.2d at 634–35. While this inference might not persuade a jury, or perhaps even survive summary judgment, it is adequate for Rule 12(b)(6) purposes.[12]

---

**12.** Similarly, I decline to accept Credit Suisse's invitation to rule as a matter of law that various research reports, taken as a whole, could not be misleading because of various cautionary notes inserted therein alongside the positive rating, or because they can be read harmoniously with Wolfenberger's emails. Even if I could draw such an

■ Alternatively, the failure to disclose the conflict can be viewed as an omission of a material fact necessary in order to make the reports not misleading. *See, e.g., Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 572–73 (E.D.N.Y.2002) (analyst's statement that a company was a "double your money stock" without disclosing conflict of interest was adequate for requirement of pleading the materiality of a false or misleading statement); *In re Credit Suisse First Boston Corp. Sec. Litig.,* No. 97–4760, 1998 WL 734365, *6 (S.D.N.Y. Oct.20, 1998) (where plaintiffs alleged that Credit Suisse issued negative stock research reports on two companies without disclosing that it had a short position on those stocks, failure to disclose short positions was an actionable omission).[13]

Defendants respond with a "truth-on-the-market" defense: that the general problems of conflicts of interest among Wall Street research analysts, and Credit Suisse's conflict regarding Razorfish specifically, were already disclosed. Indeed, they provide numerous articles concerning the general problems of analyst conflicts, and it was known to the market that Credit Suisse was the lead manager for Razorfish's IPO. Presented with a case alleging not much more than generally known conflicts, Judge Pollack of the Southern District of New York granted a motion to dismiss. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 272 F.Supp.2d 243, 250–52 (S.D.N.Y.2003).

The pervasive corruption of the research analyst's role alleged at Credit Suisse, however, was not generally known, and the Complaint pleads allegations—e.g., that Wolfenberger directly solicited Dachis's advice on what rating to issue, and that he issued ratings in order to "try and move the stock"—that the market could not have known. Nor does Credit Suisse's boilerplate disclosure of potential conflicts suffice as a matter of law when Wolfenberger and Credit Suisse knew of an actual, more specific conflict. *La Grasta v. First Union Sec., Inc.,* 358 F.3d 840, 850–51 (11th Cir.2004) (reversing dismissal based on purported actual notice, because boilerplate disclosures that analyst might seek to do business with companies that it was covering were too general and ambiguous to provide a warning that the ratings, recommendations, and target prices in the reports were not based on analyst's unbiased real opinions, but rather deliberate attempts to inflate company's stock price and attract its investment banking business); *In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 429–30 (S.D.N.Y.2003) (boilerplate disclosure in analyst reports that analyst's firm "may from time to time perform investment banking or other services for, or solicit investment banking or

---

inference at summary judgment—which I doubt, on these facts—I cannot on a motion to dismiss.

**13.** In a similar (though somewhat more egregious) case, Judge Cote of the Southern District of New York found that analyst reports were actionable for failure to disclose analogous conflicts:

The SSB Defendants' analyst reports ... were false and misleading not only because they misrepresented WorldCom's financial condition, but also because they failed to disclose key information regarding the nature and extent of an illicit *quid pro quo* arrangement that existed between the SSB Defendants and WorldCom. Had that self-serving arrangement been adequately disclosed, it would have been apparent that [the analyst's] positive reports about WorldCom and recommendations to buy WorldCom were not reliable advice from an independent analyst and trustworthy brokerage house.

*In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 404 (S.D.N.Y.2003).

other business from, any company mentioned in this report" did not, for purposes of motion to dismiss, provide notice to the public of analyst's conflict of interest).

■ Defendants' truth-on-the-market defense faces the same problem as its statute of limitations argument: the market knew of general problems, but not the nature or extent of the conflict at Credit Suisse. Whether the extent of the market's knowledge about conflicts at Credit Suisse sufficed to render Wolfenberger's omissions immaterial is a fact-specific question that is rarely an appropriate basis for dismissal. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir.2000) (truth-on-the-market defense is "intensely fact-specific" and "rarely an appropriate basis" for dismissal); *Schaffer v. Timberland Co.*, 924 F.Supp. 1298, 1309 (D.N.H.1996) ("find[ing] that the truth on the market defense presented by the defendants necessarily involves a fact-intensive inquiry which is ill-suited to a motion to dismiss").[14]

■ For these reasons, I find that Swack has adequately pled false or misleading statements and omissions against Wolfenberger and Credit Suisse for purposes of Rule 10b–5(b). She has not, however, adequately pled any against Rogers. None of the allegedly misleading research reports bore his name or have been attributed (even partially) to his authorship.[15]

## C. Rule 10b–5(a) & (c) Claims

■ Swack has also alleged violations of Rules 10b–5(a) & (c).[16] Unlike Rule 10b–5(b), these claims do not require false or misleading statements. *See In re Enron Corp. Sec., Derivative, & ERISA Litig.*, 235 F.Supp.2d 549, 577 (S.D.Tex.2002). Rather, plaintiffs must allege that "(1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter." *In re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 385 (S.D.N.Y.2003) (*"IPO Sec. Litig."*) (internal quotation marks and citation omitted).[17]

The conduct necessary to form a Rule 10b–5(a) or (c) violation can vary widely, but presumably these sections are intended to cover different conduct than Rule 10b–5(b). *See, e.g., SEC v. Martino*, 255 F.Supp.2d 268, 287 (S.D.N.Y.2003) (defining stock market manipulation broadly to include any "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the

14. Indeed, it is rarely appropriate even for summary judgment. *In re Biogen Sec. Litig.*, 179 F.R.D. 25, 37 (D.Mass.1997).

15. The complaint does refer to Rogers receiving certain of the relevant emails discussing CSFB's coverage of Razorfish. *See, e.g.*, Compl. §§ 52–53. These references alone are not sufficient to survive the heightened pleading requirements to which PSLRA cases are subjected.

16. "It shall be unlawful for any person ... (a) To employ any device, scheme, or artifice to defraud, ... [or] (c) To engage in any act, practice, or course of business which operates

as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 CFR § 240.10b–5.

17. The parties occupy themselves at some length debating whether the PSLRA's pleading standard or the ordinary Rule 9(b) standard applies to Rule 10b–5(a) & (c) actions. Since the "PSLRA's pleading standard is congruent and consistent with the pre-existing standards of this circuit," which was "notably strict and rigorous in applying the Rule 9(b) standard in securities fraud actions" even before the PSLRA, *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir.1999), this debate is largely unnecessary.

price of securities," but delineating factors suggesting that manipulation is limited to manipulating the market itself) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). If the claimed fraudulent schemes or practices consisted simply of misleading statements and omissions, then they would fall entirely within the ambit of Rule 10b–5(b), and no separate (a) or (c) actions would lie. If, on the other hand, they were part of a *broader* fraudulent "scheme," "practice," or "course of business," then they might allege something slightly different from a Rule 10b–5(b) claim, which could rest on a single misleading statement.

For instance, in *Enron Corp.* the district court held that promulgation of deceptively favorable research reports could state a manipulation claim if it was part of a larger scheme:

> Market manipulation, employment of a manipulative device, and engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and *creating and distributing false research reports favorably reviewing a company* are other types of conduct prohibited by § 10(b) and Rule 10b–5 that do not fall within the category of misleading statements and omissions.

235 F.Supp.2d at 579 (emphasis added). There, however, the issuance of dubious analyst reports was just one small part of several much broader schemes. *See id.* at 639–93.

■ Defendants question whether Swack has alleged a "scheme" or "course of business" at all. They rightly point out that the allegations of "spinning" leveled against Quattrone and Credit Suisse are not connected at all to Razorfish. Swack, however, need not rest on the "spinning" allegations. She has alleged not just that

Wolfenberger issued one or two misleading research reports, but rather that over time he worked extensively with Dachis to issue bullish research reports (and "work" Razorfish stock in conference calls and elsewhere) with the deliberate aim of boosting Razorfish's market price artificially. This adequately states a "scheme" and "course of business" under Rule 10b–5(a) and (c).

## C. Loss Causation

Defendants argue that, even if they made actionably false or misleading statements or omissions, Swack has not adequately pled that those statements or omissions actually caused her loss.

Swack has, of course, pled that the market price of Razorfish stock was artificially inflated when purchased, and attributed this artificial inflation to Defendants' misrepresentations. Compl. ¶ 120. Indeed, she has specifically pled that Wolfenberger used his prestige as a supposedly objective research analyst, and his ability to affect market price by issuing ratings, to strategically manage the price of Razorfish stock. Compl. ¶ 76 (email from Wolfenberger to Dachis inquiring whether he should issue a "strong buy" recommendation now, or "keep the upgrade in our back pocket in case we need it"), ¶ 86 (email from Wolfenberger coordinating effort with Dachis to promote Razorfish stock), ¶ 88 (email from Wolfenberger offering to "do a note before the quiet period to try and move the stock").

Defendants claim this pleading is insufficient for two reasons. First, the history of the stock prices shows that fewer than half of Wolfenberger's optimistic Razorfish reports were followed by an increase in the stock price. Second, Razorfish declined in value while Wolfenberger continued to maintain a positive rating, and when the conflicts were disclosed, no further decline occurred.

■ A § 10(b) or Rule 10b–5 plaintiff must allege that her "reliance on the defendant's misstatement caused [her] injury." *Shaw*, 82 F.3d at 1217. But what precisely the plaintiff must allege is a subject of some division among courts, and a topic on which the First Circuit has not clearly spoken.

■ It is beyond dispute that the plaintiff must adequately plead that, due to Defendants' misrepresentations, she purchased stock at an artificially inflated price. *See, e.g., Broudo v. Dura Pharms., Inc.*, 339 F.3d 933, 938–39 (9th Cir.2003), *cert. granted,* —— U.S. ——, 124 S.Ct. 2904, 159 L.Ed.2d 811 (2004). Defendants argue that Wolfenberger's ratings had little or no discernible effect on the stock price. *See* Defs.' Reply at 16 (excerpting from Def. Ex. 7). Between June 14, 1999 and February 9, 2001 Wolfenberger issued 16 allegedly fraudulent reports. On only seven of those 16 days did Razorfish's closing stock price increase from the prior day's close; on eight it decreased, and on one day it didn't change at all. Furthermore, on specific days where one might expect to see a particular effect, one does not. On June 14, 1999, when Credit Suisse began coverage of Razorfish with a "buy" rating, the stock price *declined.* On November 3, 1999, when Wolfenberger upgraded his rating to "strong buy," the price declined again. On October 27, 2000, when he finally downgraded it back to "buy," there was no change. And on May 4, 2001, when he finally downgraded it to "hold"—presumably, the correct rating for some time—it actually increased. Finally, of the seven occasions that the price increased on the same day as a positive research report was issued, four were also days on which Razorfish released positive news either that day or after the close of trading the day before. *See* Def. Exs. 40–43.

This history of stock price movements makes plaintiff's case difficult, because it leads to the suspicion that perhaps Wolfenberger—for all his "working the phones" and attempts to time his reports strategically—didn't actually have very much influence on the market. *Cf. In re Segue Software, Inc. Sec. Litig.,* 106 F.Supp.2d 161, 171 (D.Mass.2000) (Stearns, J.) (dismissing complaint and asking "if [CEO]'s statement was so market-positive, why did the price of Segue shares drop nearly $5 a share the next day?"); *In re Fidelity/Apple Sec. Litig.,* 986 F.Supp. 42, 48 (D.Mass. 1997) (Stearns, J.) (dismissing complaint for failure to allege that alleged misrepresentation in fact had an effect on the market, because plaintiff "concede[d] that no significant rise (or fall) in the price of Apple shares was precipitated by the publication of [defendant]'s statements").

The market history, however, does not lead ineluctably to the conclusion of lack of influence. Stock prices rise and fall for combinations of many different reasons. Defendants' conduct could have tempered a drop in price that would otherwise have occurred, or resulted in a greater increase than the stock would otherwise have enjoyed, absent the deceptive analyst reports. The question for Rule 12(b)(6) purposes is whether Swack must now plead the specific mechanisms by which this occurred, or whether that can await a later stage of the litigation, when she has had a chance to develop expert testimony. Several district courts have held that, under the heightened pleading standards of the PSLRA, the plaintiff must make the connection in the complaint:

Plaintiffs in eToys fail to plead in any adequate form that it was the rating, as opposed to the unchallenged content of the report or other external factors, that caused the decline. Indeed, plaintiffs in all actions ignore completely the fact

that contrary to their allegations of price inflation, the prices of the securities at issue sometimes *increased* when Merrill Lynch *downgraded* its rating, sometimes *decreased* when Merrill Lynch *upgraded* its rating, and often showed *wide fluctuations* even when Merrill Lynch issued *no reports at all.*

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 289 F.Supp.2d 416, 421–22 (S.D.N.Y.2003) ("*Merrill Lynch III*") (emphases in original); *accord Glaser,* 303 F.Supp.2d at 751 (dismissing complaint for failure to allege loss causation where "[p]laintiffs allege[d] decreases in market price during certain periods and on certain days; however, they [made] no effort to show how any of the alleged misrepresentations had any effect on the market price during those periods").

Other courts have declined to draw such inferences from market history at the pleading stage. Judge Scheindlin of the Southern District of New York refused to consider, in the 12(b)(6) posture, defendants' arguments that the stock prices were affected by causes other than their conduct:

> It is typically inappropriate, however, to look to supervening causes when examining whether a complaint has adequately pled loss causation. Unless a plaintiff pleads decisive supervening causes for its loss and thus pleads itself out of court, the requirement that a court draw all factual inferences in favor of a plaintiff at the motion to dismiss stage will usually preclude any finding of a supervening cause.... While plaintiffs' losses *may* not be attributed to the instances of misconduct they have broadly alleged, I am unable to conclude that they *cannot* be attributed to the alleged fraud.

*IPO Sec. Litig.,* 241 F.Supp.2d at 374 n. 77 (internal quotation marks and citations omitted) (emphasis added in original). These courts have emphasized the fact-intensive nature of the comparison between alleged misstatements and stock price movements. *See e.g., Gebhardt v. ConAgra Foods, Inc.,* 335 F.3d 824, 831–32 (8th Cir.2003) (declining "to attach dispositive significance to the stock's price movements absent sufficient facts and expert testimony, which cannot be considered at this [12(b)(6) ] procedural juncture, to put this information in its proper context"); *Tracinda Corp. v. DaimlerChrysler AG,* 197 F.Supp.2d 42, 67–68 (D.Del.2002) (refusing to dismiss on basis of stock price movements because "these arguments are fact intensive matters usually requiring expert testimony concerning the state of the financial markets and the like").

■ I find the latter set of decisions more persuasive. Evidence that the stock price changed in particular ways on particular days in a manner apparently inconsistent with a plaintiff's theory is powerful evidence. But it is just that—evidence. At this stage, my task is to examine the formal sufficiency of the pleadings, not to determine whether there is evidence sufficient to support a jury verdict in plaintiff's favor. In another case where I found that "an ambivalent market response" to the defendant's statements would "pose a serious challenge" to the plaintiff's claims, and was "skeptical" that the plaintiff's claims could "survive detrimental reliance inquiry given the market history," I nonetheless declined to dismiss on the basis of dubious market history:

> I am unwilling at this stage to draw conclusions regarding market reliance from ambiguous market history. In order to reject plaintiffs' market reliance allegations at this stage, I must engage in my own projections about likely market movement had there not been a failure of disclosure. There must be

actual factfinding, including perhaps expert testimony about general market trends in the NASDAQ Small Cap Market, to draw appropriate conclusions about the market impact of non-disclosure. While on initial review, the market seems to have been largely indifferent to the actionable misrepresentations I have found adequately alleged here, I cannot say with the requisite decisiveness that this is so on a motion to dismiss record.

*Blatt v. Muse Techs., Inc.*, No. 01–11010(DPW), 2002 WL 31107537, at \*14–15 (D.Mass. Aug.27, 2002).

So too here. Razorfish's market history makes Swack's burden steep; to survive summary judgment, she must offer a credible counterfactual case that, but for Wolfenberger's unduly bullish ratings, price increases would have been smaller and decreases would have been greater. But this is not a basis for dismissal. Her complaint can be fairly read, even under the heightened pleading standards of the PSLRA, to allege that the stock price was, at least on some of the dates and at least in part, affected by Wolfenberger's misleading ratings, because investors use such ratings as a factor—surely not the only factor, and perhaps not a predominant one—in making decisions. No more must be pled.

I turn now to the related question of whether plaintiff must specifically plead that, upon corrective disclosure of the truth, the artificial inflation was removed—i.e., the stock price deflated to an appropriate value. Of course, here Razorfish's stock price actually *increased* on the day that Wolfenberger downgraded it to "hold," so Swack cannot so plead. Defendants argue that this deficiency is fatal.

The Eighth and Ninth Circuits hold that a plaintiff may, for purposes of Rule 12(b)(6), plead loss causation by alleging simply that he purchased the stock at an artificially inflated price. *See Broudo*, 339 F.3d at 938–39 (reversing dismissal on grounds of failure to plead stock price drop after corrective disclosure, and holding that "loss causation does not require pleading a stock price drop following a corrective disclosure or otherwise," and may be pled by simply alleging "1) that the stock's price at the time of purchase was overstated and 2) sufficient identification of the cause for this overvaluation"); *Gebhardt*, 335 F.3d at 832 ("[P]laintiffs were harmed when they paid more for the stock than it was worth. This is a sufficient allegation.").

In contrast, the Third, Seventh, and Eleventh Circuits seem to require a stock price decline after disclosure. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir.2000) ("Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation. In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price."); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1448 (11th Cir.1997) (reversing district court's denial of Rule 50 motion before jury returned plaintiff's verdict, and "explicitly requir[ing] proof of a causal connection between the misrepresentation and the investment's subsequent decline in value."); *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir. 1990) (Posner, J.) (requiring allegation of a post-purchase decline in price), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990). The Second Circuit, after some uncertainty, now appears to lean towards the position of these circuits.

*See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 198 (2d Cir.2003) ("Plaintiff's allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement.").

The First Circuit has not yet resolved this issue. In *Lucia v. Prospect St. High Income Portfolio, Inc.,* 36 F.3d 170, 174 n. 7 (1st Cir.1994), it "expressly decline[d] to address the district court's 'loss causation' analysis, and its use of *Bastian ...*"[18] In *Shaw,* the First Circuit explained that in the typical fraud on the market case, misleading statements cause injury "if at all, .... [w]hen the truth is disclosed and the market self-corrects, [and] investors who bought at the inflated price suffer losses." 82 F.3d at 1218.

I am not convinced that there is much conflict in the cases, because I do not read the majority view always to require a stock price decline after the corrective disclosure. For example, the *Semerenko* court notes: "In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security ..." 223 F.3d at 185. It does not explicitly require that the correction come from the defendant, or that it come all at once, or that it come after an official announcement. Similarly, *Shaw* holds that the loss occurs "[w]hen the truth is disclosed and the market self-corrects, [and] investors who bought at the inflated price suffer losses." 82 F.3d at 1218. It does not require that the truth be disclosed overtly, or by the defendant.

The point to be pled and proven is that the stock price declined as the market learned the truth; the amount of decline attributable to the market's change from deceived to knowing is the measure of the plaintiff's loss. But the cases cited are perfectly consistent with the possibility that the market learned the truth gradually, and in advance of the defendant's eventual disclosure. *See, e.g., Fogarazzo v. Lehman Bros., Inc.,* No. 03 Civ. 5194, 2004 WL 1151542, at *11–13 (S.D.N.Y. May 21, 2004) (Schiendlin, J.) (finding that "[p]laintiffs here have alleged a number of events that operated, essentially, as disclosures or market corrections" with the ultimate dropping of coverage by the defendants being "the ultimate disclosure"). The reality is that stock prices sometimes self-correct in advance of the final overt disclosure. In some cases, of course, information that could only be known by the company (such as internal accounting problems) comes to light suddenly, precipitating a dramatic sell-off. In other cases—of which analysts' public ratings may be a good example—the misleading information is one factor in a soup of other publicly available data.[19] At one point, data that seem inconsistent with the analyst's rating may be discounted by the market on the theory that the analyst—who after all studies the company as his full-time job and is supposedly part of a "credible and insightful team" that is encouraged "to interpret [industry] information in a fair and objective manner"—has good reason to believe that the company's prospects are better than the data indicate. As the gap between rating and reality widens, however, the analyst's ratings gradually lose credibility and the market values them less and less. By the time the analyst bows to reality and adjusts his rating (and/or discloses the conflict that

18. In the decision below, Judge Mazzone had adopted *Bastian* for the proposition that fraud on the market, standing alone, does not establish loss causation. *See Miller v. New Am. High Income Fund,* 755 F.Supp. 1099, 1108 (D.Mass.1991).

19. Such data could include insider selling and failure to meet earnings goals.

led to the misleadingly bullish rating), the market may not be paying much attention, having already recognized the truth.[20]

The purpose of painting this picture is to explain why I will not apply a standard that would simply assume the market can only correct after an overt curative disclosure, and to the extent that the majority view cases require such an assumption—which I doubt—I decline to adopt them. But neither will I apply a standard by which the plaintiff suffers a loss at the instant she has purchased stock at an inflated price; as *Semerenko* notes, unless and until the truth emerges and the market corrects, she could sell it to another unknowing investor without suffering a loss attributable to fraud. *See* 223 F.3d at 185.

Therefore, I will not dismiss Swack's complaint on the basis that she has failed to plead that the price of Razorfish stock dropped after Wolfenberger downgraded his rating to "hold." The analysis must be more nuanced than that. The plaintiff must, indeed, plead that the price declined as the truth emerged, but she need not allege that it happened on a single day. Here Swack satisfied her pleading burden.

To be sure, the implications of this more nuanced analysis are not all favorable to Swack. Just as it is simplistic to assume that the plaintiff cannot have suffered any loss if the stock price didn't drop when the rating was downgraded, it is also simplistic to assume that the price was artificially inflated simply because it increased when a positive rating was issued. Similarly, if Razorfish's price had already declined before Wolfenberger's downgrade to "hold" because his ratings had gradually lost their credibility as the market came to know the truth anyway, then Swack must labor hard to prove that the later ratings actually inflated the price at all. Furthermore, she must prove not only at what price she would have *bought* the stock absent Wolfenberger's reports, but also at what price she would have *sold* the stock absent those reports. These are difficult burdens, but they are all fact problems for another stage in these proceedings.

## D. Scienter

To state a § 10(b) claim, the complaint must "state with particularity facts that give rise to a 'strong inference' of scienter rather than merely a reasonable inference." *Cabletron Sys.*, 311 F.3d 11, 28 (1st Cir.2002) (citing *Greebel*, 194 F.3d at 194) (quoting 15 U.S.C. § 78u–4(b)(2)). Scienter means " 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Greebel*, 194 F.3d at 194 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). In this circuit, scienter includes "a narrowly defined concept of

---

**20.** Two judges of the Northern District of Illinois have for this reason refused to dismiss complaints on loss causation grounds. *See Danis v. USN Communications, Inc.*, 73 F.Supp.2d 923, 943 (N.D.Ill.1999) (Conlon, J.) ("As plaintiffs note, simply because the price of USN stock had dropped below $1.00 per share by the time of the November 1998 disclosures does not mean that defendants' misstatements did not cause the loss.... According to plaintiffs, the market responded to and 'corrected' the price of USN stock over the better part of a year as bits and pieces of negative information became available and it became apparent that USN was not capable of performing as originally represented."); *Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, No. 97–7694, 1998 WL 774678 (N.D.Ill. Oct.21, 1998) (Coar, J.) (market corrected in advance of 1997 disclosure that 1994–95 revenues had been overstated, because 1996 revenues were accurately stated and therefore much lower than stated 1994–95 revenues; *Bastian* was satisfied even though stock price did not further drop after 1997 disclosure).

recklessness which does not include ordinary negligence, but is closer to being a lesser form of intent." *Greebel*, 194 F.3d at 188. Where the plaintiff chooses to plead scienter by intent, she may not merely allege that the defendant knew his statements were materially false, but rather must "set[ ] forth specific facts that make it reasonable to believe that defendant knew that a statement was false or misleading." *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir.1998) (citation and quotation marks omitted). If she chooses to plead scienter by recklessness, she "still must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Id.* at 9 n. 4.

The combination of motive and opportunity can, but need not, support the "strong inference" of scienter:

> We have specifically rejected the contention that facts showing motive and opportunity can never be enough to permit the drawing of a strong inference of scienter. The plaintiff may combine various facts and circumstances indicating fraudulent intent—including those demonstrating motive and opportunity—to satisfy the scienter requirement. However, "catch-all allegations" which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA.

*Cabletron Sys.*, 311 F.3d at 39 (internal citations and quotation marks omitted). "[E]vidence of conscious wrongdoing ... may provide the 'something more' necessary to prove scienter." *Id.*

▉ Here, Swack has pled a comprehensive scheme at the Tech Group whereby: analysts were rewarded for providing favorable coverage and punished for providing unfavorable coverage, and clients were promised favorable coverage in exchange for investment banking business. *See, e.g.,* Compl. ¶¶ 33–41, 43–46, 49–52, 54–62. Swack has adequately pled Wolfenberger's motive for fraudulent reports: his continued employment and his compensation. His opportunity is undisputed; Razorfish was not unambiguously an objective "strong buy" throughout the Class Period, so for most of that period he (like any other analyst) had an opportunity to boost the stock price (even if only slightly) with falsely favorable coverage.

What remains is whether Swack has specifically pled the "something more" required for scienter on Wolfenberger's part. I find that she has. She has pled that Wolfenberger: (1) solicited Dachis's opinion on how to rate Razorfish, and offered to rate the company however Dachis wanted; (2) rated Razorfish a "strong buy" even though Dachis himself told him that it was "getting hard to justify the valuations"; (3) offered to coordinate promotional efforts with Dachis to boost the price of Razorfish stock; (4) requested a meeting with Dachis to discuss a research report that Wolfenberger apparently had not yet written because Wolfenberger wanted to "do a note ... to try and move the stock"; (5) reported to Dachis that he was "[w]orking the stock" to try to boost the price; (6) was repeatedly thanked or congratulated by Dachis for his research reports ("we appreciate the continued support"; "Thanks for the continued support. We will remember your help.") and did not dissociate himself, indicating that he did not disagree with Dachis's understanding that they were favors to Razorfish rather than objective assessments; (7) and privately acknowledged "a risk of bankruptcy" with a "best case [of] dead money" and "consider[ed] reducing exposure" as early as six weeks before downgrading his public rating from "buy" to "hold." Compl. ¶¶ 76–78, 82, 86, 88–92, 94, 96–99, 101–03.

For these reasons, I find that Swack has adequately pled scienter against Wolfenberger. She has not pled scienter against Rogers. The Complaint—which hardly mentions Rogers at all—only alleges that Rogers *received* certain emails on March 21, 2001 and May 30, 2001. Compl. ¶¶ 45, 52. This is not sufficient to establish scienter or even negligence on Rogers's part.

### E. Control Person Liability

Defendant Rogers argues—as does, less credibly, Credit Suisse—that Swack has not adequately pled "control person" liability under § 20(a).[21]

 Control person liability requires that the defendant "must not only have the general power to control the company, but must also actually exercise control over the company." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir.2002) (affirming dismissal of claim against trust shareholders because they had "no direct control over the management and operations of the company" and the "most the evidence pled is that the trust defendants are controlling shareholders"). Thus, a plaintiff must make "two distinct factual allegations: [1] that the 'status' of the controlling entity gave it 'general' power over the controlled entity; and [2] that the controlling entity did, in fact, exercise such power." *In re Lernout & Hauspie Secs.*

*Litig.*, 230 F.Supp.2d 152, 175 (D.Mass. 2002) (Saris, J.) (dismissing control person claims against British subsidiary of multinational because plaintiff had not alleged that it exercised control, either in theory or in practice, over Belgian subsidiary that had misstated audit; mere fact that British entity "substantially participated in conducting audits published under" Belgian entity's name was insufficient).[22]

 Of course, Swack has adequately pled that Rogers was in a managerial position with the power to control Wolfenberger, and it is undisputed that Credit Suisse as a whole had such power. Swack's Complaint is also replete with allegations that, under Quattrone, various unnamed investment bankers, managers, and even Credit Suisse's General Counsel exercised various forms of control over analysts in general, potentially including Wolfenberger. But nowhere does she allege that *Rogers* actually exercised control over Wolfenberger, at least to the extent of controlling the contents of his research reports and/or communications with Dachis. While it might be reasonable to so assume, the PSLRA and Rule 9(b) require more: she must plead it.

Therefore, I find that Swack has adequately pled control person liability against Credit Suisse, but not against Rogers.

21. "Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

22. Swack argues that merely *having the power* to control suffices for control person liability, and cites *Bray v. R.W. Tech., Inc.*, No. 88–

0470, 1990 WL 44084, at *3 (D.Mass. Apr.3, 1990) (Zobel, J.) (entering judgment after bench trial). But Swack misreads *Bray*. After establishing as a legal proposition that "plaintiff must show that the defendant actually participated in, or exercised control over, the operations of the corporation in general and had the power to control the specific transaction in question," Judge Zobel found that a defendant *"actually participated in* and had the power to control, as President, the operations of the company." *Id.* at *1, *3 (emphasis added).

## IV. CONCLUSION

For the reasons set forth above, I find that Swack has adequately pled Count I (primary liability under § 10(b) and Rule 10b–5) against both Credit Suisse and Wolfenberger, and Count II ("control person" liability under § 20(a)) against Credit Suisse, but that she has failed to plead either against Rogers. Therefore, it is ORDERED as follows:

1. Credit Suisse's motion to dismiss is DENIED.

2. Wolfenberger's motion to dismiss is DENIED.

3. Rogers's motion to dismiss is GRANTED.